[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 31, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-14005

_____

D. C. Docket No. 02-01140-CV-JEC-1

GREGORY L. TIPPITT,

Plaintiff-Appellant,

versus

RELIANCE STANDARD LIFE INSURANCE COMPANY,
MUNICH AMERICAN REASSURANCE COMPANY GROUP
LONG TERM DISABILITY INSURANCE PLAN,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 31, 2006)**

Before BIRCH and CARNES, Circuit Judges, and TRAGER,* District Judge.

_____

* Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

CARNES, Circuit Judge:

Gregory L. Tippitt appeals the district court's entry of judgment in favor of Reliance Standard Life Insurance Company and Munich American Reassurance Company Group Long Term Disability Insurance Plan in his action for wrongful denial of benefits under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq.

## I.

In July 1982 Tippitt began working as a senior systems programmer at Munich American Reassurance Company. He enrolled in the Munich American Reassurance Company Group Long Term Disability Insurance Plan ("MARC Plan"), a benefit that was made available to him as an employee. The MARC Plan is an "employee welfare benefit plan," see 29 U.S.C. § 1002(1), as well as a "group health plan," see id. § 1191b(a)(1), governed by ERISA. Tippitt is a "participant" in the plan. See id. § 1002(7).

The MARC Plan is insured by a policy that Munich purchased from Reliance. Reliance administers the plan and pays all benefits from its own assets. See 29 U.S.C. § 1002(21)(A)(i), (iii). To the extent that it exercises any discretionary control or authority respecting management of the plan or its assets, Reliance is a fiduciary under ERISA. Firestone Tire & Rubber Co. v. Bruch, 489

2

U.S. 101, 113, 109 S. Ct. 948, 955–56 (1989); Cotton v. Mass. Mut. Life Ins. Co., 402 F.3d 1267, 1277 (11th Cir. 2005). As a fiduciary, Reliance must administer the plan "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries" and "in accordance with the documents and instruments governing the plan . . . ." 29 U.S.C. § 1104(a)(1)(A)(i), (D). Reliance must also provide a "full and fair review" of claim denials. Id. § 1133(2).

The MARC Plan states that an insured is entitled to monthly benefits if he "(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to us." An insured is "totally disabled" if "during the Elimination Period, an Insured cannot perform each and every material duty of his/her regular occupation." The plan does not define the term "regular occupation." An insured completes the elimination period by being totally disabled for 180 consecutive days. After 180 days of total disability have elapsed, the insured may begin receiving benefits.

The MARC Plan states that an insured is "partially disabled" if "as a result of an Injury or Sickness [the] Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis." The plan notes that "[a]n Insured who is Partially Disabled will

3

be considered Totally Disabled, except during the Elimination Period." In other words, an insured who is only partially disabled, as opposed to totally disabled, during the first 180 days of his disability is not entitled to any benefits under the plan. However, an insured who is totally disabled for the first 180 days of his disability, and who later improves to the point of being partially disabled, is entitled to benefits.

While employed at Munich, Tippitt suffered from joint pain, back pain, cluster headaches, and fatigue. Between December 1997 and September 1999, he regularly visited his primary care physician for treatment. On November 30, 1999, that physician referred Tippitt to a second physician, who is a board certified immunologist and rheumatologist. Tippitt visited that specialist several times over the course of the following year and complained to him about pain in multiple joints, particularly in his hips, and reported that his activity levels were increasingly restricted.

On January 10, 2000, shortly after Tippitt was promoted to assistant manager of computer information systems, he resigned from his job. On June 20, 2000, he filed an application for benefits, claiming that he became totally disabled on January 7, 2000. Tippitt's primary care physician, specialist, physical therapist, and ophthalmologist submitted reports about his medical condition to Reliance.

4

In support of his application for benefits, Tippitt sent Reliance a Position Questionnaire which had been prepared by him and approved by Munich's assistant vice president of information services. The questionnaire stated that Tippitt's duties included implementing and maintaining all computer hardware and software systems, providing technical assistance to staff, conducting research and development, and performing administrative tasks. Munich also submitted to Reliance a Job Analysis form, which reported that Tippitt was "frequently" required to stand, walk, and sit while performing his job. The form also indicated that Tippitt's job required him to use both of his hands and did not allow him to alternate between sitting and standing.

On October 24, 2000, Reliance notified Tippitt that he was ineligible for benefits because, under the terms of the plan, he was not "'Totally Disabled' from each and every material duty of [his] occupation." Reliance found that Tippitt's job most closely resembled the job description for "manager, computer operations" from the Department of Labor's Dictionary of Job Titles, and Reliance used that job description, instead of the actual duties of Tippitt's job, to define his regular occupation. Reliance determined that Tippitt was "capable of sedentary level activity with limited repetitive use of [his] upper extremities and the ability to

5

alternate position as needed." It concluded that he was "capable of performing a majority of the material duties of [his] occupation."

On November 17, 2000, Tippitt asked Reliance to review its denial of his claim. In support of his request for review, Tippitt provided Reliance with updated medical records from his treating physicians.

In a letter dated April 2, 2001, Reliance stated that it had affirmed its decision to deny benefits. The letter explained that: "In order to meet the definition of 'Total Disability,' an Insured must suffer a condition so severe, it renders him or her unable to perform the material duties of his or her regular occupation," and that he had not shown that. Reliance acknowledged that Tippitt complains of pain with prolonged sitting, but it said that the pain "should not limit his ability to perform his occupation as this occupation would allow for ample opportunity for position changes." The letter informed Tippitt that Reliance's decision was "now final" because he had exhausted all of the administrative remedies available under the plan.

On April 3, 2002, Tippitt filed suit under ERISA against Reliance, and also against the MARC Plan as an "entity," see 29 U.S.C. § 1132(d)(1), alleging that he had been wrongfully denied benefits. The relief Tippitt sought was all benefits due him under the plan, an order enforcing and clarifying his right to future benefits,

6

declaratory and injunctive relief, and interest, costs, and attorney's fees.  In the alternative, Tippitt sought reversal of the denial of benefits or an order remanding the claim to the MARC Plan and requiring an additional administrative review, along with interest, costs, and attorney's fees.

Following a bench trial, the district court issued an order on June 22, 2005, denying Tippitt any relief and entering judgment in favor of Reliance and the MARC Plan.  The order explained in some detail the district court's reasoning.  That reasoning and our discussion of it will be easier to follow if we precede them with an explanation of the applicable legal framework.

**II.**

A court must follow a well-defined series of steps in reviewing a denial of benefits decision in an ERISA case.  See HCA Health Servs. of Ga., Inc., v. Employers Health Ins. Co., 240 F.3d 982, 993–95 (11th Cir. 2001).  "At each step, the court makes a determination that results in either the progression to the next step or the end of the inquiry."  Id. at 993.

In step one, a court must determine which standard to apply in reviewing the claims administrator's benefits decision.  Hunt v. Hawthorne Assocs., Inc., 119 F.3d 888, 912 (11th Cir. 1997).  ERISA itself does not provide the appropriate standard.  Firestone, 489 U.S. at 108–09, 109 S. Ct. at 953 (1989); Marecek v.

7

BellSouth Telecomms., Inc., 49 F.3d 702, 705 (11th Cir. 1995).  A court chooses the appropriate standard after examining the plan documents to determine whether they grant the administrator discretion to interpret disputed terms.  HCA, 240 F.3d at 993.  If the court finds that the documents do not grant the administrator discretion, it applies de novo review to the administrator's benefits determination and does not proceed to the remaining steps.  Firestone, 489 U.S. at 115, 109 S. Ct. at 956–57; Buckley v. Metro. Life, 115 F.3d 936, 939 (11th Cir. 1997).  "If the court finds that the documents grant the claims administrator discretion, then at a minimum, the court applies arbitrary and capricious review and possibly heightened arbitrary and capricious review" and proceeds to the second step.  HCA, 240 F.3d at 993.

In step two, regardless of whether arbitrary and capricious review or the heightened form of that standard of review applies, the court reviews de novo the claims administrator's interpretation of the plan to determine whether it is "wrong."  HCA, 240 F.3d at 993.  "'Wrong' is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms de novo, the court disagrees with the claims administrator's plan interpretation."  Id. at 993 n.23.  If the court determines that the

8

administrator's interpretation is right, the inquiry ends, but if it determines that the interpretation is wrong, the court proceeds to step three. See id. at 993–94.

In step three, the court decides whether "the claimant has proposed a reasonable interpretation of the plan." HCA, 240 F.3d at 994 (internal quotation marks omitted). If the court concludes that he has, it continues on to step four. In step four, the court must "determine whether the claims administrator's wrong interpretation is nonetheless reasonable." Id. If it is reasonable, then the "interpretation is entitled to deference even though the claimant's interpretation is also reasonable," and the court moves to step five. Id.

Finally, in step five, the court must consider the self-interest of the administrator. HCA, 240 F.3d at 994. "If no conflict of interest exists, then only arbitrary and capricious review applies and the claims administrator's wrong but reasonable decision will not be found arbitrary and capricious." Id. The inquiry ends at that point. Id. If a conflict does exist, then heightened arbitrary and capricious review applies. Id. "[T]he burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest." Id. The claims administrator must show that "its wrong but reasonable interpretation of the plan benefits the class of participants and beneficiaries." Id. at 994–95. Even if the administrator satisfies this burden, the insured may still be entitled to benefits

9

"if he can show by other measures that the administrator's decision was arbitrary and capricious." Id. at 995.

## III.

In reviewing Reliance's denial of benefits, the district court followed the analytical process we have just outlined. In step one the court found that because the MARC Plan required the insured to "submit satisfactory proof of Total Disability to [Reliance]," it conferred discretion upon Reliance to determine eligibility for benefits. Therefore, either plain arbitrary and capricious review or the heightened version of it was appropriate. The court then found that there was a conflict of interest between Reliance's profit-making and fiduciary roles, making heightened arbitrary and capricious the right standard. In doing so, the court relied upon Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321 (11th Cir. 2001), which involved the same plan language at issue here.

In step two, the court reviewed de novo Reliance's interpretation of the MARC Plan. The court addressed the provision that states that an insured is totally disabled if "during the Elimination Period, [the] Insured cannot perform each and every material duty of his/her regular occupation." The court found that under this provision, an insured is not totally disabled if he "can perform even one of the material duties of his or her occupation."

10

The court then reviewed de novo the administrative record that was before Reliance when it denied Tippitt's claim and subsequent appeals. The court found that during and after the elimination period, Tippitt "could perform some of the duties of [his occupation] during the three hours of sedentary work that multiple members of plaintiff's medical team, and apparently plaintiff himself, reported that plaintiff could complete." The court held that this ability rendered Tippitt ineligible for benefits regardless of whether the court defined his occupation according to the Job Analysis form completed by Munich or the DOT job description used by Reliance. Accordingly, the court held that Reliance's denial of benefits "was not 'wrong,' but 'right.'"

The court ended its inquiry there, at the second step, and did not proceed to the remaining steps of the analysis. The court determined that Tippitt was not entitled to benefits and that Reliance had not breached any of the fiduciary duties it owed him. This appeal followed. Tippitt's first argument focuses on what the court did in step one and his other two arguments focus on what the court did in step two.

**IV.**

Tippitt contends that the district court erred when it determined that it should review Reliance's decision to deny benefits using the heightened arbitrary and

capricious standard. He argues that the district court should have applied de novo review because the plan's requirement that an insured "submit[] satisfactory proof of Total Disability to us" does not grant Reliance discretion, but instead serves as a promise to pay benefits if certain conditions are met. Reliance and the MARC Plan contend that heightened arbitrary and capricious review was appropriate because the plan language does grant Reliance discretion through the "satisfactory . . . to us" language. In any event, they say, we are bound by our decision in Levinson.

The plan language in Levinson, like that here, required the insured to "submit[] satisfactory proof of Total Disability to [Reliance]." Levinson, 245 F.3d at 1324. Not satisfied with the proof Levinson submitted, the plan administrator denied benefits, and Levinson filed suit against it. Id. The administrator argued that its decision was only subject to arbitrary and capricious review, and Levinson eventually agreed. Id. at 1324–25. The district court, applying arbitrary and capricious review, granted Levinson's motion for summary judgment, and the administrator appealed. Id.

In step one of our analysis in Levinson, this Court stated that review was to determine whether the denial was arbitrary and capricious. 245 F.3d at 1325. Later we noted that because there was a conflict of interest between the administrator's fiduciary and profit-making roles, heightened arbitrary and

12

capricious review was proper.  Id. at 1326.  We are bound by Levinson to apply the same heightened arbitrary and capricious standard of review in this case.

Tippitt argues that we should not feel bound to follow Levinson even though the plan language is identical, because Levinson did not argue for de novo review.  The Levinson opinion, however, does not indicate that the Court meant to assume away that issue or reserve it for decision in some future case where the standard of review issue was contested.  Instead, the opinion states the standard of review in terms of a conclusion or holding:  "Because the policy gives the administrator discretion to determine eligibility for benefits, we must determine whether the administrator's decision was arbitrary and capricious."  245 F.3d at  1325.  Tippitt's argument that we should not be bound by Levinson because this point was not really argued in that case runs afoul of our decisions that a prior panel precedent cannot be circumvented or ignored on the basis of arguments not made to or considered by the prior panel.  See Cohen v. Office Depot, Inc., 204 F.3d 1069, 1076 (11th Cir. 2000) ("Unless and until the holding of a prior decision is overruled by the Supreme Court or by the en banc court, that holding is the law of this Circuit regardless of what might have happened had other arguments been made to the panel that decided the issue first.").  Accordingly, under our binding

13

precedent the district court did not err in determining that the appropriate standard of review is heightened arbitrary and capricious.

## V.

Tippitt contends that the district court erred by defining his "regular occupation," for purposes of the plan, through use of a DOT job description that does not reflect the actual duties he performed in his job at Munich. Even assuming that the duties listed in the DOT's description for "manager, computer operations" were substantially different from those Tippitt actually performed, the district court did not err. The court did not define Tippitt's regular occupation solely with respect to the duties listed in the DOT job description. The court decided that Tippitt was ineligible for benefits regardless of whether it used Munich's Job Analysis form or the DOT job description as a standard. It found that "[u]nder either standard, plaintiff could perform some of the duties of either description." Its decision was not affected by use of the DOT job description.

## VI.

Tippitt contends that the district court erred by interpreting "total disability" so that an insured is not totally disabled if he can perform any–"even one"—material duty of his regular occupation.

14

ERISA does not provide any guidance on how a court should interpret provisions in an employee welfare benefit plan. See Dixon v. Life Ins. Co. of N. America, 389 F.3d 1179, 1183 (11th Cir. 2004) ("Although comprehensive in many respects, ERISA is silent on matters of contract interpretation."). The federal courts "have the authority to develop a body of federal common law to govern issues in ERISA actions not covered by the act itself." Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1041 (11th Cir. 1998) (internal quotation marks omitted). "When crafting a body of common law, federal courts may look to state law as a model because of the states' greater experience in interpreting insurance contracts and resolving coverage disputes." Id.; see also Hauser v. Life Gen. Sec. Ins. Co., 56 F.3d 1330, 1333 (11th Cir. 1995). "To decide whether a particular rule should become part of ERISA's common law, courts must examine whether the rule, if adopted, would further ERISA's scheme and goals," which include: "(1) protection of the interests of employees and their beneficiaries in employee benefit plans; and (2) uniformity in the administration of employee benefit plans." (internal citation omitted). Horton, 141 F.3d at 1041.

"Under Georgia law, the words used in the [insurance] policy are to be given their usual and common significance and are to be construed in their ordinary meaning." Giddens v. Equitable Life Assurance Soc'y of U.S., 445 F.3d 1286,

15

1292 n.5 (11th Cir. 2006) (internal quotation marks and alteration omitted) (citing Larson v. Ga. Farm Bureau Mut. Ins. Co., 520 S.E.2d 45, 46 (Ga. Ct. App. 1999)). A court does not examine "what the insurer intended its words to mean, but rather what a reasonable person in the insured's position would understand them to mean." W. Pac. Mut. Ins. Co. v. Davies, 601 S.E.2d 363, 368–69 (Ga. Ct. App. 2004) (internal quotation marks omitted). "[A]mbiguity exists if the policy is susceptible to two or more reasonable interpretations that can fairly be made, and one of these interpretations results in coverage while the other results in exclusion." Shahpazian v. Reliance Standard Life Ins. Co., 388 F. Supp. 2d 1368, 1375 (N.D. Ga. 2005); accord Luton v. Prudential Ins. Co. of Am., 88 F. Supp. 2d 1364, 1370 (S.D. Fla. 2000). If there is no ambiguity and only "one reasonable construction is possible, the court will enforce the contract as written." Sapp v. State Farm Fire & Cas. Co., 486 S.E.2d 71, 73 (Ga. Ct. App. 1997).

If the plan is ambiguous, under Georgia decisions and our own we must construe the ambiguities against the drafter, and the claimant's interpretation is considered correct. HCA, 240 F.3d at 994 n.24; see Lee v. Blue Cross/Blue Shield of Ala., 10 F.3d 1547, 1551 (11th Cir. 1994) ("Having determined that the plan is ambiguous, we hold that application of the rule of contra proferentem is appropriate in resolving ambiguities in insurance contracts regulated by ERISA.");

16

see also Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala., 41 F.3d 1476, 1481 n.4 (11th Cir. 1995) ("Blue Cross's argument that contra proferentem should not apply to self-funded ERISA plans is specious.  We held in Lee, 10 F.3d at 1551, that contra proferentem does apply to ERISA plans."); Davies, 601 S.E. 2d at 369 ("When the language of an insurance contract is ambiguous and subject to more than one reasonable construction, the policy must be construed in the light most favorable to the insured, which provides him with coverage."); Erie Indem. Co. v. Lascala, 424 S.E.2d 820, 822 (Ga. Ct. App. 1992) ("Where an insurance contract is ambiguous or is capable of being construed variously, it must be construed against the insurer and in favor of the insured.").

We begin our interpretation of the MARC Plan with the definition of "total disability."  An insured who "cannot perform each and every material duty" is one who cannot perform any duties or one who can perform fewer than all of his duties.[1]  The definition of "total disability" does not explicitly provide the time standard against which an inability to perform a duty is to be measured.  Reliance and the MARC Plan seem to argue that the time standard is "any amount of time."  We believe, however, that the standard must be the ordinary work period, which usually is a work day.  Many, if not most, job duties exist throughout the work day.

---

[1] Whenever we refer to "duties" we are referring to material duties.  The immaterial duties do not matter in this case.

17

In order to perform a job satisfactorily, to carry out its duties, a worker must be able to perform the tasks it requires from the beginning to the end of the work day. Otherwise, he cannot perform its tasks or carry out its duties. This is another way of saying that the duty of a job is to perform its tasks as many times, and as long throughout the work day, as the job requires.

Our belief that the time standard applicable to the "cannot perform" component of the total disability definition is reinforced, and perhaps compelled, by the combined effect of two other provisions of the plan. One is the non-equivalence clause of the plan, which provides that "[a]n Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period." The clear and necessary effect of that provision is that anything which fits within the definition of partial disability cannot be total disability. Otherwise, the non-equivalence clause would not make any sense. We know then that anything which fits within the definition of partial disability is not total disability.

The other provision that reinforces our conclusion is the plan's definition of partial disability. It provides that an insured is partially disabled if: "[the] Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis." We interpret this provision in the same way that Tippitt does. An insured is partially disabled if he

18

can perform: (1) "all" of the duties of the occupation on a part-time basis; or (2) some of those duties on a full-time basis. We read the word "all" into the first clause of the definition because the plan drafters used the limiting word "some" in the second clause but not in the first. See Mountain Aire Realty, Inc. v. Birdie White Enters., Inc., 593 S.E.2d 900, 902–03 (Ga. Ct. App. 2004) ("In ascertaining the intent of the parties, the court should ascertain the parties' intent after considering the whole agreement and interpret each of the provisions so as to harmonize with the others."); see also S. Trust Ins. Co. v. Dr. T's Nature Prods. Co., 584 S.E.2d 34, 35–36 (Ga. Ct. App. 2003); cf. Burlington N. & Santa Fe Ry. Co. v. White, __ U.S. __, 126 S. Ct. 2405, 2412 (2006) ("We normally presume that, where words differ as they differ here, Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks omitted); DIRECTV, Inc. v. Brown, 371 F.3d 814, 818 (11th Cir. 2004) ("[W]hen Congress uses different language in similar sections, it intends different meanings.") (internal quotation marks omitted).

As we have said, reading the non-equivalence clause with the definition of partial disability tells us what total disability is not. If an insured can perform all of the duties of the occupation for a substantial fraction of the work day, but not all day long, he can do them only on a part-time basis, which puts his condition within

19

the definition of partial disability. And because that insured is partially disabled, he is not totally disabled within the meaning of the plan. Likewise, if the insured can perform some, but not all, of the duties of his occupation for the entire work day, and during each work day as it comes, he is partially disabled; therefore, he is not totally disabled within the meaning of the plan.

The insureds who are too disabled to fit within the partial disability definition, then, are those who cannot perform all of the duties of the occupation on a part-time basis and who also cannot perform any of the duties on a full-time basis. An insured who is so disabled that he cannot perform any duty any of the time or can perform only some of the duties some of the time is totally disabled. And when the plan includes within the definition of partial disability, and therefore excludes from total disability, those who can perform all of the duties of the occupation "on a part-time basis" we construe it to mean for a substantial part of the work day, not for some inconsequential fraction. A person who can perform all the duties of an occupation for only a few minutes a day before passing out cannot perform them "on a part-time basis" in a way that would be of interest to anyone other than a law professor. To the extent that the decisions in Carr v. Reliance Standard Life Ins. Co., 363 F.3d 604, 607 (6th Cir. 2004), and Gallagher v.

20

Reliance Standard Life Ins. Co., 305 F.3d 264, 275 (4th Cir. 2002), are inconsistent with our decision today, we disagree with them.

**VII.**

The district court rested its rejection of Tippitt's claim on a finding (which Tippitt does not dispute) that he "could perform some of his duties . . . during the three hours of sedentary work" he could do each day. The court itself emphasized "some." Accepting the factual premise, we cannot accept the legal one which is that anyone who can perform some of his duties during some of the work day is partially disabled and therefore not totally disabled. As we have already explained, only if Tippitt could not perform (during the elimination period) all of his duties during the three-hour period or some other substantial fraction of the work day would he be partially disabled and therefore not totally disabled.

We do not know whether Tippitt could perform all of his duties during the three-hour period or only some of them. That seems to be disputed and the district court did not make any findings about it. Nor do we know whether he could perform any of his duties full-time, because the district court did not address that question either. We need to remand for those findings, because it is not the role of appellate courts to make findings of fact. Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S. Ct. 1527, 1530 (1986) ("If the Court of Appeals believed that

21

the District Court had failed to make findings of fact essential to a proper resolution of the legal question, it should have remanded to the District Court to make those findings. . . . [I]t should not simply have made factual findings on its own."); Didie v. Howes, 988 F.2d 1097, 1104 (11th Cir. 1993) ("We . . . are not factfinders."); Smith v. Zant, 887 F.2d 1407, 1419 (11th Cir. 1989) ("The role of a reviewing court is not to . . . reassess the facts but to make sure that the conclusions derived from the district court's . . . assessments are judicially sound and supported by the record.") (alteration and internal quotation marks omitted).

Accordingly, we remand to the district court to make additional findings of fact and to complete the remaining steps of the process, consistent with this opinion, in order to determine whether Tippitt is totally disabled and thereby eligible for benefits under the plan.

**REVERSED** and **REMANDED** for further proceedings consistent with this opinion.