MORSE LLC, d/b/a Cyberknife Center of Miami (Patient: Danilo Garcia), Plaintiff,

v.

BECKMAN COULTER, INC., et al., Defendants.

No. 05–22791–CIV.

United States District Court, S.D. Florida. Miami Division.

Sept. 25, 2006.

Gary J. Guzzi and Nina K. Brown Akerman Senterfitt, Miami, FL, for Beckman Coulter, Inc and the Beckman Coulter, Inc. Welfare Benefits Plan.

Kirk Gibbons, Gibbons, Cohn et al., Tampa, FL, for Blue Cross Blue Shield.

James Pinkert, The Pinkert Law Firm, Miami, FL, Nancy Wear, Coral Gables, FL, for Plaintiff.

## ORDER GRANTING DEFENDANT BLUE CROSS LIFE & HEALTH'S MOTION FOR SUMMARY FINAL JUDGMENT

COOKE, District Judge.

THIS CAUSE is before the Court upon Defendant Blue Cross Life & Health's Mo-

tion for Summary Final Judgment (DE 46), filed July 18, 2006. Plaintiff filed its response on August 14, 2006. Thereafter, Defendant Blue Cross Life & Health filed its reply on August 28, 2006. The Court having carefully reviewed the Motions finds, for the reasons set forth below, that Defendant Blue Cross Life & Health's Motion for Summary Final Judgment should be granted.

### I. BACKGROUND

Plaintiff instituted this action on October 21, 2005. In its Second Amended Complaint, Plaintiff alleges that in early 2005 it received authorization from Defendant Blue Cross Life & Health ("BCLH") to treat Danilo Garcia ("Mr. Garcia") for life threatening conditions. Compl. at ¶ 8. Plaintiff further avers that Defendant Beckman Coulter, Inc. Welfare Benefits Plan ("BCWBP")was supposed to pay for the treatment. *Id.* Plaintiff alleges that on March 20, 2005, BCLH denied Mr. Garcia's claim on the basis that its peer clinical reviewer had determined that the proposed treatment in question (Cyberknife Stereotactic Radiosurgery) was an experimental treatment. *Id.* at ¶¶ 9–10. Plaintiff alleges that it used the treatment in question to successfully treat Mr. Garcia's condition while an appeal of BCLH's denial was pending. *Id.* at ¶ 12. However, according to Plaintiff, the appeal was denied. *Id.* at ¶ 12. Moreover, Plaintiff claims that subsequent appeals of BCLH's decision were also denied. *Id.* at ¶¶ 12–14. Plaintiff asserts that the treatment in question has been approved for use by the FDA since 2001 and has been used to successfully treat a multitude of patients with conditions similar to those of Mr. Garcia. *Id.* at ¶ 28. Therefore, Plaintiff contends that the Defendants' failure to pay the charges submitted for Mr. Garcia's treatment constitutes a breach of contract and creates a valid claim under the Employee Retirement Income Security Act ("ERISA").

### II. PROCEDURAL HISTORY

Defendant Blue Cross Life & Health filed it's Motion for Summary Final Judgment (DE 46) on July 18, 2006. Plaintiff filed its response on August 14, 2006. Thereafter, Defendant Blue Cross Life & Health filed its reply on August 28, 2006. Thus, Defendant Blue Cross Life & Health filed it's Motion for Summary Final Judgment is ripe for adjudication.

### III. SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial . . . [o]nly when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Id.* at 607. Thus, the nonmoving party " 'may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also, Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) stating "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." However, the court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

### A. ERISA STANDARD OF REVIEW

ERISA does not provide a standard by which to review decisions of a plan administrator. *Marecek v. BellSouth Telecomms., Inc.*, 49 F.3d 702, 705 (11th Cir. 1995) (*citing Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). However, the U.S. Supreme Court has established three standards by which courts may review decisions of plan administrators: "(1) de novo where the plan does not grant the administrator discretion[;] (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened

arbitrary and capricious where there is a conflict of interest." *Shaw v. Connecticut General Life Ins. Co.*, 353 F.3d 1276, 1282 (11th Cir.2003) (*quoting HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir. 2001)). *See Firestone Tire & Rubber Co.*, 489 U.S. at 109–15, 109 S.Ct. 948. In order to determine the appropriate standard of review, a court is required to examine all of the plan documents. *Shaw*, 353 F.3d at 1282 (*citing Cagle v. Bruner*, 112 F.3d 1510, 1517 (11th Cir.1997)). "If the court finds that the documents grant the claims administrator discretion, then at a minimum, the court applies arbitrary and capricious review and possibly heightened arbitrary and capricious review." *Id.* (*citing HCA Health Services*, 240 F.3d at 993).

On June 7, 2006, this Court granted Defendants' Motion to Determine ERISA Standard.[1] In granting Defendants' Motion, the Court concluded that the appropriate standard to govern this case was the arbitrary and capricious standard of review. *See* Order Granting Defendants' Motion to Determine ERISA Standard.[2] Under the arbitrary and capri-

---

**1.** Defendant Beckman Coulter, Inc. filed its Motion to Determine ERISA Standard of Review on January 25, 2006. Plaintiff did not file a response brief. Consequently, on May 19, 2006, this Court directed Plaintiff to file a response brief on or before May 31, 2006. On May 26, 2006, Defendant Blue Cross Life & Health joined Defendant Beckman Coulter, Inc.'s Motion to Determine ERISA Standard of Review. However, as of June 6, 2006 Plaintiff still had not filed a response brief. Further, Plaintiff did not request an extension of time to file its response. Therefore, on June 7, 2006 this Court resolved the Defendants' Motion to Determine ERISA Standard of Review without the benefit of a response brief from Plaintiff.

**2.** It should be noted that in its Order Granting Defendants' Motion to Determine ERISA

Standard this Court made a finding that the heightened arbitrary and capricious standard of review was not applicable to the present action because the plan administrator was not operating under a conflict of interest. In that Order, this Court stated the following:

Typically, a conflict of interest exists where the entity making the eligibility determination is the same entity that funds the claim payment. *See e.g. Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1325–26 (11th Cir.2001)(*citing Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1563–64 (11th Cir.1990)). *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. at 109–15, 109 S.Ct. 948. Thus, the heightened arbitrary and capricious standard of review is applicable where there is a conflict between the insurer's

cious standard of review the court must first evaluate the claims administrator's interpretation of the plan to determine whether it was "wrong." [3] *HCA Health Services,* 240 F.3d at 993. To determine whether the claims administrator's interpretation was wrong the court conducts a *de novo* review of the claims administrator's interpretation of the plan. *Tippitt v. Reliance Standard Life Ins. Co.,* 457 F.3d 1227, 1232 (11th Cir.2006). Further, the Eleventh Circuit has held that when a plan administrator's benefits decision is subject to arbitrary and capricious review, only the evidence before the plan administrator at the time the benefits decision was made may be considered in ruling upon a claim challenging that denial. *See Jett v. Blue Cross and Blue Shield of Ala.,* 890 F.2d 1137, 1139 (11th Cir.1989) (stating that under the arbitrary and capricious standard of review "the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."); *Lee v. Blue Cross and Blue Shield of Ala.,* 10 F.3d 1547, 1550 (11th Cir.1994) ("Application of the arbitrary and capricious standard requires us to look only to the facts known to the administrator at the time the decision

was made" to deny coverage). Thus, when conducting a review of an ERISA benefits denial under the arbitrary and capricious standard the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made. *Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1451 (11th Cir.1997) (*citing Jett,* 890 F.2d at 1139).

**IV.** ANALYSIS

**A.** BCLH's DECISION WAS NOT "WRONG"

Because this Court has concluded that the arbitrary and capricious standard of review is appropriate in this matter, the Court shall limit its review to that evidence which was before BCLH at the time it denied Mr. Garcia's claim for benefits. *See id.* As previously discussed, one of the initial steps in this Court's analysis is to determine whether BCLH's decision to deny benefits was "wrong." *See Tippitt,* 457 F.3d at 1232. Thus, this Court must determine whether it disagrees with BCLH's plan interpretation. *See id.*

The Plan documents in question consists of the Beckman Coulter Inc. Welfare Benefits Plan as well as those documents in-

---

fiduciary role and its profit making role. *Id.* In the present action, there is no discernable conflict of interest. Defendant BCLH makes the claim determinations but it does not pay the claim expenses. Exs. C and D. Instead, the Plan is self funded through a combination of funds from Defendant Beckman Coulter, Inc and its employees. *Id.* Further, the claim expenses are funded through funds from Defendant Beckman Coulter, Inc. and its employees. *Id.* Defendant BCLH (the entity which makes the claim determinations) is paid a fee on a per-subscriber basis which is not altered regardless of whether claims are approved or denied. *Id.*
Order Granting Defendants' Motion to Determine ERISA Standard at 5.

3. "'Wrong' is the label used by [the Eleventh Circuit] to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms de novo, the court disagrees with the claims administrator's plan interpretation." *HCA Health Services,* 240 F.3d at 993 n. 23 (*citing Yochum v. Barnett Banks, Inc.,* 234 F.3d 541 (11th Cir.2000)). If a court agrees with the claims administrator's decision, the inquiry ends and the administrator's decision will be upheld. *Id.* at 993–94. However, if a court disagrees with the administrator's decision (i.e., the court concludes that the administrator's decision was wrong), then the court employs a burden-shifting analysis to see if that wrong decision was tainted by self-interest. *Id.* at 993–95.

corporated by reference. Def. Mot. to Determine ERISA Standard Ex. A at 1. The Summary Plan Description (the "SPD") as set forth in the Beckman Coulter Inc. Employee Guidebook is incorporated by reference into the Beckman Coulter Inc. Welfare Benefits Plan. Therefore, in its analysis the Court shall review the relevant provisions of the Beckman Coulter Inc. Welfare Benefits Plan as well as the relevant provisions of the SPD as it is incorporated within the Plan.

The relevant provisions of the Plan state as follows:

A covered charge incurred under both the PPO and the EPO Plans is limited to the reasonable and customary charge for medically necessary services or supplies as determined by the standards of generally accepted medical practice, or the negotiated charge under the preferred provider program. The reasonable and customary charge is the charge prevalent in the area where the provider is located for the service or supply furnished, and is limited to the amount customarily charged by the provider. A charge is incurred when the service or supply giving rise to the charge is rendered or received. Def. Mot. to Determine ERISA Standard Ex. B at 2A–16. Medical costs under both the PPO and EPO Plans are not covered if the care, services and supplies received are not prescribed by a physician or are not medically necessary. In addition, charges for the following are not covered ... Charges for or in connection with experimental procedures or treatment methods not approved by the American Medical Association or the appropriate medical specialty society. *Id.* at 2A–22.

In order for the full benefits of the PPO and EPO Plans to be payable, the following criteria must be met ... The services must be medically necessary and appropriate ... If you proceed with any services that have been determined to not be medically necessary and appropriate at any stage of the utilization review process, benefits will not be provided for those services. *Id.* at 2A–33.

Medical benefits are financed by contributions from employees and the Company. The amount of the contribution is determined by the Company. Benefits are paid from the assets of the Beckman Coulter Welfare Benefits Plan Trust. *Id.* at 2A–38.

In its Motion, BCLH contends that Mr. Garcia's claim was denied because Cyberknife Stereotactic Radiosurgery was an unproven, experimental, and investigational treatment for the type of condition which Mr. Garcia had at the time the claim was processed. Mot. at 7. BCLH provided this Court with the administrative record in this case. In its response, Plaintiff did not suggest that the administrative record lacked materials or failed to include all of Plaintiff's submissions. Further, throughout its response brief Plaintiff relied on the materials BCLH submitted as the administrative record in this case. *See* Opp. However, in its response Plaintiff directed this Court to examine additional evidence which is outside the parameters of the administrative record. This evidence includes unsworn allegations contained in the Complaint and ALJ opinions not considered or presented to BCLH at the time that Mr. Garcia's claim was processed. *See e.g.* Opp. at 6. Therefore, the Court will not consider these documents and allegations as they were not contained within the administrative record. *See e.g. Jett*, 890 F.2d at 1139 (under the arbitrary and capricious standard of review "the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts known to the admin-

istrator at the time the decision was made."); *Lee*, 10 F.3d at 1550 ("[a]pplication of the arbitrary and capricious standard requires us to look only to the facts known to the administrator at the time the decision was made to deny Lee coverage"); *Paramore*, 129 F.3d at 1451.

The Court will now summarize the administrative record in this case. Prior to March 30, 2005, Danilo Garcia sought coverage for Cyberknife Stereotactic Radiosurgery. Edwards' Aff. at ¶ 3. BCLH submitted Mr. Garcia's request for review by a peer clinical reviewer to determine if the requested services represented the standard of care in the medical community for Mr. Garcia's condition. Specifically, BCLH requested that the reviewer determine whether the Cyberknife Stereotactic Radiosurgery treatment was equivalent or superior to currently accepted treatments. Further, a determination was requested as to whether Mr. Garcia's request for treatment should be approved. Dr. Mark K. Ono, a licensed and Board certified doctor in Radiology and Radiation Oncology, conducted this review. *See* Edwards' Aff. Ex. A. In his review, Dr. Ono concluded that Cyberknife Stereotactic Radiosurgery was an experimental and/or investigational treatment for patients with a solitary liver metastasis from a primary colon cancer (Mr. Garcia's condition). *Id.* Further, Dr. Ono concluded that Cyberknife Stereotactic Radiosurgery was not the standard of care within the medical community and that Cyberknife Stereotactic Radiosurgery's equivalency or superiority to accepted treatments was not proven. *Id.* Finally, because he found the services to be experimental and/or investigational for Mr. Garcia's specific condition, Dr. Ono, did not recommend approval of the services unless the standard surgical approach was not recommended by a surgical oncologist. *Id.* Notably, Dr. Ono indicated that he had reviewed Mr. Garcia's medical records and that his compensation for performing the review was not dependent in any way on the outcome of Mr. Garcia's case. Thus, it appears that Dr. Ono's conclusions were based upon an independent review of Mr. Garcia's request for services.

On March 30, 2005, BCLH notified Mr. Garcia of its decision not to certify his request for services. *See* Edwards' Aff. Ex. C. In the letter of non-certification, BCLH informed Mr. Garcia that BCLH's peer clinical reviewer Dr. Harry Weisman, as part of BCLH's utilization review program, had determined that Stereotactic Radiosurgery was an experimental and/or investigational treatment for patients with a solitary liver metastasis from a primary colon cancer (Mr. Garcia's specific condition). *Id.* Further, the letter indicated that the treatment in question was not the standard of care in the medical community and that the treatment of choice was surgical resection. *Id.* Thus, it appears that in addition to Dr. Ono's review Dr. Weisman also performed a review of Mr. Garcia's request for services.

By letter dated April 7, 2005, the Plan subscriber, Carmen Diaz–Garcia, filed an appeal of BCLH's non-certification. Edwards' Aff. Ex. D. In her letter, Mrs. Garcia disputed BCLH's finding that Stereotactic Radiosurgery was experimental. Specifically, Mrs. Garcia argued that over 7000 patients worldwide had received the treatment and that the treatment was covered by other major insurance companies. *See id.* Additionally, Plaintiff provided material in support of Mrs. Garcia's appeal. Specifically, Plaintiff submitted a letter written by Dr. Rodrigues, dated March 2, 2005, which detailed several studies involving Stereotactic Radiosurgery and recommended that BCLH approve the treatment for Mr. Garcia. Edwards' Aff. Ex. E. While the appeal was pending,

Plaintiff performed Cyberknife Stereotactic Radiosurgery on Mr. Garcia.[4]

On May 11, 2005, BCLH submitted Mr. Garcia's appeal to AllMed Healthcare Management for an additional independent review. Edwards' Ex. F. In its request for review, BCLH asked AllMed to consider: 1) whether the requested Cyberknife Stereotactic Radiosurgery represented the standard of care in the medical community for Mr. Garcia's condition; 2) whether the Cyberknife Stereotactic Radiosurgery was experimental and/or investigational; 3) whether Cyberknife Stereotactic Radiosurgery was equivalent or superior to accepted treatments: and 4) whether Mr. Garcia's claim should be approved. Within this request BCLH included the March 2, 2005 letter from Dr. Rodrigues as well as a copy of Blue Cross Medical Policy 4.11.08. On May 12, 2005, AllMed issued its response to BCLH's request for independent review. Edwards' Ex. G. In this response, Dr. Skip Freedman (on behalf of AllMed) made the following conclusions: 1) Cyberknife Stereotactic Radiosurgery was not the standard of care for patient's with Mr. Garcia's condition; 2) Cyberknife Stereotactic Radiosurgery's equivalency or superiority to accepted treatments was unproven; and 3) Cyberknife Stereotactic Radiosurgery was considered unproven, experimental, and investigational. Further, Dr. Freedman indicated that in reaching these conclusions he had reviewed Dr. Rodrigues' March 2, 2005 letter, Blue Cross Medical Policy 4.11.08, and several clinical studies regarding Stereotactic Radiosurgery treatment for liver metastasis. *Id.*

BCLH issued an appeal outcome letter on May 12, 2005. On May 18, 2005, Plaintiff formally appealed BCLH's decision to deny Mr. Garcia's claim. Edwards' Aff. Ex. H. In its appeal, Plaintiff disputed BCLH's contention that Cyberknife Stereotactic Radiosurgery was investigational. Specifically, Plaintiff advised BCLH that the U.S. Food and Drug Administration (the "FDA") approved Cyberknife Stereotactic Radiosurgery for whole body treatment in August of 2004. Additionally, Plaintiff stated: 1) over 80 published peer review medical journal articles have described the Cyberknife system's safety and efficacy; 2) the Cyberknife treatment is recognized as a sophisticated radiosurgical tool; and 3) Cyberknife procedures are recognized and approved by U.S. insurance intermediaries and Medicare. Further, Plaintiff included the following for BCLH's review: Letter of Medical Necessity from Dr. Rodrigues; Letter of Medical Necessity from Dr. Berhmann; FDA documentation regarding the Cyberknife treatment; a treatment record for Mr. Garcia; and a health insurance claim form.

BCLH submitted Plaintiff's appeal to Dr. George Spalding for a peer clinical review. Edwards' Aff. Ex. J. As part of his review, Dr. Spalding reviewed the documentation which Plaintiff submitted as well as Blue Cross Corporate Medical Policy SURG 00017.[5] *Id.* In his review, Dr. Spalding reached the following conclusions: 1) Medical Policy SURG 00017 specifically limited the use of Stereotactic Radiosurgery to intracranial lesions; 2) there was a lack of studies regarding the safety and effectiveness of radiosurgery for hepatic lesions in comparison with standard therapies; and 3) the Cyberknife proce-

---

4. Mr. Garcia received the Cyberknife Stereotactic Radiosurgery on April 28–29, 2005. Edwards' Aff. Ex. E.

5. Blue Cross Corporate Medical Policy SURG 00017 was the updated Blue Cross corporate medical policy which had a last review and effective date of April 28, 2005. Edwards' Aff. Ex. I.

dures performed on Mr. Garcia were investigational and not eligible for contract benefits. Edwards' Aff. Ex. J. By letter dated June 20, 2005, BCLH informed Plaintiff that its claim was being denied for the reasons set forth in Dr. Spalding's peer clinical review. Edwards' Ex. K.

■ From the administrative record it is evident that Mr. Garcia's claim received multiple layers of review, including two independent reviews, before it was ultimately denied. Further, against this backdrop of multiple extensive reviews this Court cannot conclude that BCLH's denial was "wrong." As previously discussed, " '[w]rong' is the label used by [the Eleventh Circuit] to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms de novo, the court disagrees with the claims administrator's plan interpretation." *HCA Health Services,* 240 F.3d at 993 n. 23 *citing Yochum v. Barnett Banks, Inc.,* 234 F.3d 541 (11th Cir.2000). In the case at bar, the Plan documents clearly establish that charges for experimental procedures are not covered charges or considered to be medically necessary. *See infra* 6–7. Additionally, the Plan establishes that in order for the full benefits of the Plan to be payable, the services rendered must be medically necessary and appropriate. *See id.* The administrative record in this case more than adequately supports BCLH's determination that Cyberknife Stereotactic Radiosurgery was an experimental treatment which was not medically necessary for a patient with Mr. Garcia's medical condition.

### B. BCLH's DECISION WAS REASONABLE

Moreover, even if this Court were to find that BCLH's decision was "wrong," the Court cannot conclude that the decision was arbitrary and capricious. Throughout its Motion, Plaintiff attempts to argue the merits, safety, and efficacy of Cyberknife Stereotactic Radiosurgery. *See e.g.* Opp. at 7–8. Further, Plaintiff appears to urge this Court to overturn BCLH's decision on the basis that Plaintiff disagrees with the decision. However, under the arbitrary and capricious standard of review a claims administrator's decision should not be overturned merely because the plaintiff or a court may disagree with the decision. *See Turner v. Delta Family–Care Disability & Surv. Plan,* 291 F.3d 1270, 1274 (11th Cir. 2002)("It is irrelevant that the court or anyone else might reach a different conclusion"). Instead, under the arbitrary and capricious standard of review, the question presented before this Court is whether BCLH's "wrong" decision was nonetheless reasonable. *See Tippitt,* 457 F.3d at 1232. The Court is mindful that Mr. Garcia's treatment was successful. Nevertheless, the success of Mr. Garcia's treatment does not compel a finding that BCLH's decision to deny coverage was arbitrary and capricious. The arbitrary and capricious standard of review does not authorize this Court to play "Monday morning quarterback" when it comes to such medical determinations.

After reviewing the record in this case the Court finds that BCLH's decision was reasonable. The Plan's provisions concerning experimental treatments as well as the multiple layers of medical review which consistently concluded that the Cyberknife treatment was experimental and therefore not covered under the Plan substantiates the reasonableness of BCLH's decision to deny Mr. Garcia's claim. Therefore, on this basis the Court concludes that BCLH's decision to deny Mr. Garcia's claim was not arbitrary and capricious. *See HCA Health Services,* 240 F.3d at 994 ("If the court determines that the claims administrator's wrong interpreta-

tion is reasonable, then this wrong but reasonable interpretation is entitled to deference even though the claimant's interpretation is also reasonable").

## V. CONCLUSION

Accordingly, it is hereby

ORDERED AND ADJUDGED as follows:

1. Defendant Blue Cross Life & Health's Motion for Summary Final Judgment (DE 46) is GRANTED.

2. Plaintiff's Cross Motion for Summary Judgment is DENIED.

3. All pending motions are DENIED AS MOOT.

4. The Clerk is directed to CLOSE this case.