[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 25, 2010
JOHN LEY
CLERK

_____

Nos. 09-10800 and 09-14256

_____

D. C. Docket No. 07-03121-CV-TWT-1

MARTIN R. WASCHAK,

Plaintiff-Appellee,

versus

THE ACUITY BRANDS, INC.
SENIOR MANAGEMENT BENEFIT PLAN,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(June 25, 2010)

Before BIRCH, BARKETT and KRAVITCH, Circuit Judges.

PER CURIAM:

In 09-10800, Acuity Brands, Inc. ("Acuity") seeks review of the district court's decision to grant equitable estoppel to Martin Waschak so that he could continue to receive retirement benefits at a certain rate.[1] Acuity also challenges the grant of attorney's fees in 09-14256. After careful consideration, we AFFIRM the grant of estoppel but REVERSE the grant of attorney's fees.

## I. BACKGROUND

Waschak is a former vice president of Lithonia Lighting, which Acuity now owns. Waschak enrolled under Acuity's Senior Management Benefit Plan ("the Plan"), an unfunded plan whose benefits are paid out from Acuity's general assets. Employees who contribute to the Plan are general unsecured creditors of Acuity.

Waschak contributed to the Plan for eight years, beginning at the Plan's inception in 1985. He retired 31 March 1999 and began collecting retirement benefits 1 April 2001. At this point, he began to receive monthly payments, based on his contributions plus interest earned thereon, which were to continue for fifteen years.

Generally, the Plan calls for an employee's account to be credited annually with that year's interest earnings. The Plan defined the interest rate (the "Interest Earnings Rate") as the Moody's Interest Rate plus three percentage points.

---

[1]Unless otherwise indicated, all record citations are to the record filed in No. 09-10800.

Moody's publishes its rates monthly; the Interest Earnings rate used a rolling twelve-month average of the Moody's rates.

The Plan contemplates two periods of participation. The first phase is the "Deferral Period," which extends from the participant's enrollment until his retirement, and during which time the participant pays into the Plan. After retirement is the "Determination Date," after which the participant can receive funds in the "Payment Period."

The Plan states in § 5.5, "Payment of Retirement Benefits," that:

> [t]he amount payable for the first year hereunder shall be an amount that will fully amortize the balance in Participant's Deferred Benefit Account, as of the Participant's Benefit Determination Date, over the fifteen (15) year period, based on assumed interest earnings using the Interest Earnings Rate . . . as of said Benefit Determination Date.

Id. at 199. Section 5.4(a) of the Plan is titled "Determination of Retirement Benefits." It states that, when an employee retires,

> a benefit shall be payable to such Participant ("Retirement Benefit") equal to the greater of: (i) the total amount of such Participant's Deferred Benefit Account . . . as of his Benefit Determination Date, including interest at the Interest Earnings Rate, through such Benefit Determination Date; or (ii) the amount determined pursuant to Schedule B attached hereto and made a part hereof . . .

Id. at 197. The Schedule B form referenced in the Plan bears the heading "Summary of Guaranteed Minimum Annual Retirement Benefits" and it lists an annual benefit, Waschak's account balance at retirement, and the total retirement

3

benefit.

For years, the Plan interpreted § 5.4 to guarantee that, during both the Deferral Period and the Payment Period, Waschak's account would be credited with interest at the rate of Moody's plus three percentage points or at a minimum of 11%, whichever was greater. After Waschak began receiving benefits in April 2001, his monthly payments never fell below $4,165.90, which reflected an 11% interest rate. The Plan explained this practice in a letter sent to Waschak in August 2004: "Since your guaranteed payment of $4,165.90 is greater than the calculated payment, your monthly payment will continue to be the guaranteed amount." R2-23 at 425.

In 2006, the Plan wrote to inform Waschak that this practice was the result of a "misinterpretation." Id. at 437. The Plan's position since that point has been that Waschak was entitled to the greater of the Interest Earnings rate or the 11% minimum only during the Deferral Period, and that, once he moved into the Payment Period, he was only entitled to the Interest Earnings Rate, even if that happened to fall below 11%. As a result, the Plan told Waschak that it had, over the years, overpaid him by more than $12,000, which the Plan would claw back by reducing future payments to him.

Waschak filed a formal claim with the Plan Administrator on 7 February

4

2007, seeking to have the 11% minimum reinstated. After the Plan Administrator denied his claim, he appealed to the Plan's Administrative Committee and was denied. Waschak then filed suit in district court. Both parties moved for summary judgment and the district court granted Waschak's motion. The district court found that the Plan was ambiguous and that Waschak was entitled to the 11% minimum during the payment period under a theory of equitable estoppel; it also awarded attorney's fees. Specifically, it found that the following sentence in § 5.5 could be interpreted two ways:

> The amount payable for the first year hereunder shall be an amount that will fully amortize the balance in Participant's Deferred Benefit Account, as of the Participant's Benefit Determination Date, over the fifteen (15) year period, based on assumed interest earnings using the Interest Earnings Rate . . . as of said Benefit Determination Date.

The district court construed this passage as follows:

> Here again, benefits are calculated "based on assumed interest earnings using the Interest Earnings Rate." If that clause modifies the full amortization of the balance (i.e., during the payment period), then the entire section of the Plan is consistent, and the clear language in regards to payment using the Interest Earnings Rate should control. However, the clause at issue could have another meaning. If that clause ["based on assumed interest earnings using the Interest Earnings Rate"] modifies "the balance in Participant's Deferred benefit Account, as of the Participant's Benefit Determination Date," then § 5.5 directly conflicts with § 5.4(a) [because] § 5.4(a) compares the guaranteed minimum rate and the variable rate at least at the time of retirement (or the Benefit Determination Date).

R3-31 at 9. If, then, the quoted sentence in § 5.5 can be understood to direct that

5

benefits as of the Determination Date should be calculated using solely the Interest Earnings Rate, then this conflicts with § 5.4(a), which compares the Interest Earnings Rate and the 11% minimum rate as of that Date. Id.

The district court analyzed § 5.4(a) to determine whether it did, in fact, conflict with § 5.5 under this construction. One portion of § 5.4(a) incorporates Schedule B by reference:

> a benefit shall be payable to such Participant ("Retirement Benefit") equal to the greater of: (i) the total amount of such Participant's Deferred Benefit Account . . . as of his Benefit Determination Date, including interest at the Interest Earnings Rate, through such Benefit Determination Date; or (ii) the amount determined pursuant to Schedule B attached hereto and made a part hereof . . .

R2-23 at 197. The district court concluded that Schedule B, a "Summary of Guaranteed Minimum Annual Retirement Benefits," reflected payments based on an 11% minimum rate and that, accordingly, § 5.4(a) could not be read to foreclose the use of the 11% minimum past the deferral period.

On appeal, Acuity argues that the district court erred in finding the Plan ambiguous. It disputes the district court's reasoning in finding that § 5.5 was ambiguous, in interpreting § 5.4(a) to incorporate Schedule B by reference, and in construing Schedule B as a guarantee of future benefits. It also appeals the award of attorney's fees.

## II. DISCUSSION

6

A. Equitable Estoppel

On appeal, Acuity contends that the district court erred in granting summary judgment to Waschak. In an ERISA action, we review a district court's grant of summary judgment de novo. Green v. Holland, 480 F.3d 1216, 1222 (11th Cir. 2007). This means that we use the same standard that controlled the district court's determination: summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Id.; Fed. R. Civ. P. 56(c).

We recognize a "very narrow common law doctrine under ERISA for equitable estoppel." Katz v. Comprehensive Plan of Group Ins., 197 F.3d 1084, 1090 (11th Cir. 2000) (citation omitted). Equitable estoppel is appropriate where "(1) the relevant provisions of the plan at issue are ambiguous, and (2) the plan provider or administrator has made representations to the plaintiff that constitute an informal interpretation of the ambiguity." Jones v. American Gen'l Life and Accident Ins. Co., 370 F.3d 1065, 1069 (11th Cir. 2004) (citations omitted).

We must review whether the Plan's terms were, as the district court held, ambiguous. "[A]mbiguity exists if [a given] policy is susceptible to two or more reasonable interpretations that can fairly be made." Tippitt v. Reliance Standard Life Ins. Co., 457 F.3d 1227, 1235 (11th Cir. 2006) (quotation marks and citation

7

omitted).  In making this determination, we bear in mind two principles.  First, we apply the doctrine of contra proferentum when assessing ambiguities in plans governed by ERISA.  Jones, 370 F.3d at 1070.  Second, ERISA does not guide courts in interpreting benefits plans.  See Dixon v. Life Ins. Co. of N. America, 389 F.3d 1179, 1183 (11th Cir. 2004) ("Although comprehensive in many respects, ERISA is silent on matters of contract interpretation.").  "When crafting a body of common law, federal courts may look to state law as a model because of the states' greater experience in interpreting insurance contracts and resolving coverage disputes."  Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1041 (11th Cir. 1998).  Under Georgia law, courts do not analyze "what the insurer intended its words to mean, but rather what a reasonable person in the insured's position would understand them to mean."  Tippitt, 457 F.3d at 1235 (quotation marks and citation omitted).

Acuity urges that the alternative interpretation of the Plan, outlined by the district court, is not reasonable.  It relies on our precedent in Sharron v. Amalgamated Ins. Agency Servs., Inc., 704 F.2d 562 (11th Cir 1983), to argue that the alternative interpretation put forth by the district court cannot be reasonable because it relies too heavily on a small section of the overall Plan.  Accordingly, it argues that the Plan's language is not subject to more than one reasonable

8

interpretation and is, therefore, not ambiguous. In <u>Sharron</u>, the district court, in assessing whether an entire plan was ambiguous, "examined only its summary and explanation section on the ground that an employee would have difficulty comprehending the Plan itself." 704 F.2d at 566. Though the Plan argues that the district court similarly "unreasonably focused on" Schedule B, the alternative interpretation "examined" more than just Schedule B, addressing the Plan's unabridged language in §§ 5.4 and 5.5 in assessing whether the interaction of those sections produced an ambiguity. Appellant's Brief 27. Acuity offers no section of the Plan that the district court failed to consider and that would have resolved the ambiguity it found. The district court did not run afoul of our established jurisprudence in <u>Sharron</u>.

Further, the fact that the district court deemed the Plan's new interpretation of the relevant language "sensible" does not preclude such language from being open to another reasonable interpretation under our precedent. Appellant's Brief 19. The Alabama state rules of construction cited by the district court do not absolutely bind its discretion. This case, under Georgia law, determines ambiguity through the eyes of the insured. Under that standard, we affirm the district court's finding that the Plan's relevant language, which was subjected to two interpretations even by Acuity, which drafted it, is ambiguous.

In the second analytical step of equitable estoppel, we ask whether representations from a plan's provider or administrator amounted to an informal interpretation of the ambiguous terms. Waschak amply meets this element. The Plan itself historically interpreted its own language to bind it to pay Waschak an 11% minimum if that exceeded the Interest Earnings Rate during the Payment Period. It granted payments to Waschak reflecting an 11% rate during the Payment Period when the Interest Earnings Rate fell below that minimum. It communicated to Waschak that his payments remained at 11% in these cases because he was guaranteed such minimum payments.

The district court did not err in finding that the Plan's representations to Waschack over the course of years constituted an informal interpretation of the Plan's language. Nor did it err in concluding that the Plan's terms were ambiguous. Accordingly, the two elements for an equitable estoppel claim are established. We AFFIRM the district court's grant of summary judgment on Waschak's equitable estoppel claim.

## B. Attorney's Fees

ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action" in claims by a participant or beneficiary. 29 U.S.C. § 1132(g)(1). We have set forth five factors to guide the discretion of

10

district courts in this area:

> These factors include: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

McKnight v. Southern Life and Health Ins. Co., 758 F.2d 1566, 1571-72 (11th Cir. 1985). No single factor is necessarily outcome-determinative. Id. On appeal, we review the district court's application of these factors for abuse of discretion. Byars v. Coca-Cola Co., 517 F.3d 1256, 1268 (11th Cir. 2008). We do not require district courts to enumerate every factor, as long as they are taken into account. Id. Here, though, in its treatment of the first and third factors, the district court exceeded the scope of its discretion.

As to the first factor, the district court observed that "[t]he Plaintiff has not shown that the Defendant acted in bad faith." No. 09-14256 R3-52 at 6. It noted that, in fact, Acuity had "attempted to soften the blow" by clawing back the alleged overpayment gradually by reducing future payments. Id. Though Waschak failed to carry the burden as to this factor, the district court concluded its consideration of the merits on this point by asserting that Acuity had "demonstrated exceedingly grotesque selfishness in its treatment of retirees such as [Waschak]." Id. The first

11

factor under McKnight only properly concerns evidence of bad faith. The district court offered no evidentiary support for its charge of selfishness. In making this assessment without support from the record, the district court exceeded the scope of its discretion as to this factor.

After correctly noting that the second factor – the Plan's ability to pay attorney's fees – concededly favored Waschak, the district court discussed the third factor, general deterrence. It held that this factor weighed in Waschak's favor and based this conclusion on two key points that, together, amount to error.

The district court first cited McKnight's assertion that awarding fees can "encourage other employers to furnish understandable and accurate summary plans upon which employees can reasonably rely in calculating their benefits." Id. at 7 (quoting 758 F.2d at 1572). The district court supported its analysis as to this factor by citing two non-precedential opinions, one of which quoted dicta from one of our cases that has been substantially abrogated. Id. at 8. If too much weight is given to the general policy preference for simpler plans, this factor can be reduced to a syllogism that will always favor the imposition of fees; indeed, the very fact of litigation is always evidence that a plan could have been made simpler.

Under the original understanding of the Plan, Acuity did provide Waschak with accurate information on which he could rely. There is no evidence that the

12

representations on which Waschak relied were inaccurate or misleading when made and no bad faith was demonstrated. The secondary interpretation adopted by the Plan was, as the district court recognized, "sensible." Indeed, we have found that the existence of "valid legal arguments" in favor of a defendant in this sort of case is a sufficient basis to find in favor of the defendants on this factor. See Freeman v. Cont'l Ins. Co., 996 F.2d 1116, 1119 (11th Cir. 1993) (per curiam).

Second, the district court referenced the "more generic concern that attorney's fees always deter the improper denial of benefits." R3-52 at 8. Again, the district court's assertion seems to have the effect of creating a presumption – at least as to this factor – in favor of the imposition of fees. If an award of fees is, in fact, "always" a deterrent, then the third McKnight factor is rendered meaningless because it will always weigh in favor of the beneficiary. In our jurisprudence, finding in favor of a beneficiary who sues for benefits does not obligate the court to grant fees. See Byars, 517 F.3d at 1268. The district court's analysis on this factor relied on two points that impermissibly created a presumption in favor of awarding fees. We find this to constitute reversible error.

## III. CONCLUSION

Acuity appeals the award of estoppel, arguing that the Plan was not ambiguous; it also appeals the award of attorney's fees. Because the Plan's

13

language was ambiguous, and because the district court did not focus on an impermissibly narrow or unrepresentative section of the Plan, we AFFIRM the grant of estoppel. Because the district court misapplied the McKnight factors in a way that favored an award of fees, we REVERSE the award of attorney's fees.

**AFFIRMED IN PART, REVERSED IN PART.**