[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 19-10651

————————————————

D.C. Docket No. 0:15-cv-62195-JIC

DARREN MICKELL,
an individual,

Plaintiff - Appellant,

versus

BERT BELL / PETE ROZELLE NFL PLAYERS RETIREMENT PLAN,
a welfare benefit plan,

Defendant - Appellee.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(October 15, 2020)

Before MARTIN, ROSENBAUM, and TALLMAN[*], Circuit Judges.

MARTIN, Circuit Judge:

Darren Mickell is a former NFL player seeking total and permanent disability benefits under the NFL Player Retirement Plan (the "Plan") for injuries he sustained during his football career.  Mr. Mickell submitted an application for disability benefits to the Plan, and the Plan's Retirement Board (the "Board") denied his application.  Mr. Mickell petitioned the District Court to review the denial under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.  The District Court upheld the Board's decision.  Mr. Mickell appealed.  After careful review, and with the benefit of oral argument, we reverse the District Court's order and remand Mr. Mickell's case to the District Court.

## I.    BACKGROUND

Mr. Mickell spent nine years in the NFL as a defensive end, one of the most punishing positions in the game of football.[1]  During his NFL career, Mr. Mickell was repeatedly subjected to high speed contact hits, which resulted in multiple

---

[*] Honorable Richard C. Tallman, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1] According to an NFL study, the defensive end position "tend[s] to experience a greater overall frequency of impacts than speed positions and have the greatest proportion of impacts to the front of the helmet."  See Michael D. Clark, et al., Effects of Career Duration, Concussion History, and Playing Position on White Matter Microstructure and Functional Neural Recruitment in Former College and Professional Football Athletes, Radiology, Oct. 31, 2017, available at https://pubs.rsna.org/doi/full/10.1148/radiol.2017170539.

orthopedic injuries to his back, ribs, shoulders, arms, hands, knees, hips, legs, and feet.  He had surgeries on both shoulders and both knees; had to have his hip drained multiple times; and was given a number of medications and frequent injections to keep him in the game.  Mr. Mickell also sustained multiple "blow[s] to the head" that affected his cognitive function such that he would have trouble answering questions and would have to sit out plays.  He eventually left the NFL in 2001 as a result of chronic back, shoulder, and knee pain and frequent headaches from these injuries.

As a former NFL player, Mr. Mickell is an eligible participant of the Plan. The Plan provides retirement, disability, and other related benefits to eligible NFL players.  In keeping with its name, the Plan's Disability Initial Claims Committee (the "Committee") reviews initial claims for disability.  Players may appeal Committee decisions to the Plan's six-member Board, which then reviews these claims de novo.  When deciding a player's application for disability benefits, the Board may refer a player for an evaluation with one or more physicians selected by the Plan (referred to as the Plan Neutral Physicians).  The Plan provides that "Neutral Physician reports . . . will be substantial factors" in the Board's decision.

It was in September 2013 that Mr. Mickell applied for disability benefits under the Plan, based on impairments to his knees, hips, back, and shoulders.[2] To aid in making its initial determination, the Committee had Mr. Mickell evaluated by several Plan Neutral Physicians. Dr. Chaim Arlosoroff, an orthopedist, evaluated Mr. Mickell and concluded he is not totally and permanently disabled, saying he "can engage in any type of light to moderate duty work" but "should avoid employment" where he engaged in activities that caused him pain.[3] Dr. Barry McCasland, a neurologist, evaluated Mr. Mickell and reviewed "certain of his medical records." Dr. McCasland found that Mr. Mickell has a "chronic headache disorder," "very mild cognitive impairment," and "significant depression and anxiety disorder," but concluded he was not totally and permanently disabled. Neuropsychologist Dr. Stephen Macciocchi evaluated Mr. Mickell and his medical records and concluded that "there is no current psychometric evidence" that Mickell could not work.

Mr. Mickell also provided evidence of his disability. He submitted his medical records, including reports from his treating physicians, who opined that

[2] In his initial application, Mr. Mickell noted he was working full time as a freight handler, so the Committee denied his application based on this employment. Mr. Mickell appealed that decision, claiming he was eligible for disability benefits because he made less than $30,000 per year. The Board allowed Mr. Mickell to re-present his claim so it could consider whether his impairments met the definition of disability.

[3] Dr. Arlosoroff did not review Mr. Mickell's medical records.

Mickell was not able to work.  For example, Mr. Mickell submitted a report from Dr. Mark Todd, a licensed psychologist and clinical neuropsychologist, who said that Mr. Mickell's "mood symptoms are a prominent problem that could contribute to and may even account for his difficulties."  But Dr. Todd also expressed concern that Mr. Mickell's "problems may also be more reflective of a significant cognitive disorder related to a potential history of multiple concussive injuries."  Dr. Todd concluded that Mr. Mickell's "mood and behavior together with his physical problems and cognitive difficulties" are "likely to prohibit him from consistently attending work or completing work requirements."  Mr. Mickell also submitted the report of board-certified physical medicine and rehabilitation physician, Dr. Craig Lichtblau.  Dr. Lichtblau opined that Mr. Mickell will not be able to maintain employment because he "does not have the functional capacity to work 4 hours per day on an uninterrupted basis at this time."  Dr. Lichtblau also suggested that Mr. Mickell's condition was permanent and opined that "his disability will actually increase over time."

Based on the Plan Neutral Physicians' opinions, the Committee denied Mr. Mickell's initial application for disability benefits.  Mr. Mickell appealed this decision to the Board, which required him to undergo additional evaluations. Orthopedist Dr. George Canizares evaluated Mr. Mickell and his records and concluded that Mickell could work despite suffering from several back, shoulder,

hand, hip, and knee issues.  Dr. Peter Dunne, neurologist, noted that Mr. Mickell's "major problems appear to be orthopedic," but agreed Mickell had a mild cognitive disorder.  Yet Dr. Dunne said Mr. Mickell had no deficits that impact his employability.  Dr. Sutapa Ford, a neuropsychologist, administered tests and reviewed Mr. Mickell's records.  Dr. Ford concluded that Mr. Mickell's cognitive scores "were generally intact to mildly impaired," but recommended he undergo validity testing because he scored poorly on validity measures.  The Board reviewed these opinions and Mr. Mickell's appeal and referred him to one last doctor: psychiatrist Dr. Raymond Faber.  Dr. Faber found that Mr. Mickell's psychological difficulties did not "rise to a level that precludes some kind of employment" like "assisting in sports programs for youths."

As he had done with the Committee, Mr. Mickell also submitted additional evidence to the Board.  This evidence included a report from Dr. Peggy Vermont, a psychologist, who concluded that, "[d]ue to the severity of his mood and anxiety symptoms," Mickell was not able to work.  Rosa Gonzalez, a Licensed Mental Health Counselor, concluded that Mr. Mickell was unable to work based on his cognitive and emotional impairments.

The Board ultimately denied Mr. Mickell's application for benefits.  The Board communicated the basis for its denial: "the reports of the Plan's seven (7) neutral physicians, all . . . found that [he is] not totally and permanently disabled

6

by [his] orthopedic, neurological, cognitive, and/or psychiatric impairments." The Board acknowledged "the presence of potentially conflicting medical evidence in the record," but discounted that evidence in light of the absolute discretion given to it by the Plan to weigh the evidence. The Board placed less weight on Mr. Mickell's evidence because that evidence "indicated [he had] certain impairments but did not directly address whether [he is] totally and permanently disabled."

Two months after the Board's decision, Mr. Mickell filed his complaint in the District Court, seeking review under ERISA. After each party moved for summary judgment, the District Court affirmed the denial of Mr. Mickell's disability application. It held that the Board properly applied the standard for Disability as defined in the Plan. The court also held the Board's denial of benefits was not arbitrary and capricious because the Plan Neutral Physicians' opinions provided a reasonable basis for the denial. As part of its decision on this issue, the District Court noted that the Board did not err when it failed to consider the cumulative effect of Mr. Mickell's conditions. It "agree[d] with Defendant that the fact that the Plan Neutral Physicians limited their conclusions to areas within their expertise actually supports the reliability of their reports." Mr. Mickell appeals the District Court's order.

7

## II.    STANDARD OF REVIEW

Under ERISA, a participant in a covered retirement plan may sue the plan administrator for recovery of benefits.  Hamilton v. Allen-Bradley Co., Inc., 244 F.3d 819, 824 (11th Cir. 2001).  "We 'review de novo a district court's ruling affirming or reversing a plan administrator's ERISA benefits decision, applying the same legal standards that governed the district court's decision.'"  Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan, 833 F.3d 1299, 1306 (11th Cir. 2016) (quoting Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011) (per curiam)).  "We also review de novo a district court's grant of summary judgment."  Id.  Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

This Circuit has outlined a six-part test for reviewing a plan administrator's benefits decision:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it

8

(hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Blankenship, 644 F.3d at 1355.

We are not required to decide whether the plan administrator's decision was de novo wrong. Rather, we may assume the decision was de novo wrong in order to reach the discretion question. See, e.g., Doyle v. Liberty Life Assur. Co. of Bos., 542 F.3d 1352, 1357 (11th Cir. 2008) (noting that the District Court could skip to step two when reviewing summary judgment order and determining whether the administrator had discretion to review benefit claims under the plan). Then, because the Board was vested with "full and absolute discretion, authority and power to interpret, control, implement, and manage the Plan and the Trust," the parties agree that we should begin our analysis at step three of the Blankenship test. See Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1282 (11th Cir. 2003) (explaining that plan administrator's discretion is based on "all of the plan documents" (quotation marks omitted)). We must therefore determine whether the

9

Board abused its discretion in denying Mr. Mickell's claim for disability benefits. Yochum v. Barnett Banks, Inc. Severance Pay Plan, 234 F.3d 541, 544 (11th Cir. 2000) (per curiam) ("[T]he 'arbitrary and capricious' standard . . . is analogous to an abuse of discretion standard.").

### III.    DISCUSSION

Mr. Mickell makes three arguments on appeal.  First, he claims the Board incorrectly interpretated and improperly applied the Plan's definition of Disability. Second, he argues the Board abused its discretion by reflexively adopting the opinions of the Plan Neutral Physicians and ignoring evidence he submitted. Finally, Mr. Mickell says the Board should have taken the cumulative effects of his impairments into account, and it abused its discretion by failing to do so.

### A. THE BOARD DID NOT ERR IN INTERPRETING AND APPLYING THE PLAN'S DEFINITION OF DISABILITY.

Mr. Mickell claims the District Court erred in granting the Plan's motion for summary judgment because the Board applied an unreasonable definition of Disability.  The "General Standard" of Disability as defined in the Plan Documents states that:

> An Eligible Player . . . will be deemed to be totally and permanently disabled if the Retirement Board or the Disability Initial Claims Committee finds (1) that he has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit . . ., and (2) that such condition is permanent. . . .

10

> A Player will not be considered to be able to engage in <u>any occupation or employment for remuneration or profit</u> within the meaning of this Section 5.2 <u>merely because such person . . . receives up to $30,000 per year in earned income</u>. . . .

Plan Documents § 5.2(a) (emphases added).

More to the point, Mr. Mickell says that the term "any occupation or employment for remuneration or profit" is limited by the qualified term "up to $30,000 per year in earned income." He asserts a reasonable person would read the Plan's definition of Disability to mean "that a Player is Disabled if he is 'substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit' that would afford him 'up to $30,000 per year in earned income.'" Br. of Appellant at 37 (quoting Plan Documents § 5.2(a)). We therefore must determine if the Plan Documents define Disability based on whether a player is unable to work a job that earns him more than $30,000 per year.

"ERISA does not provide any guidance on how a court should interpret provisions in an employee welfare benefit plan." <u>Tippitt v. Reliance Std. Life Ins. Co.</u>, 457 F.3d 1227, 1234 (11th Cir. 2006). But federal courts can develop a body of federal common law to govern issues of ERISA contract interpretation. <u>See</u> <u>id.</u> at 1234–35. We therefore may look to state law as a model for how to interpret the Plan. <u>Id.</u> at 1235. Mr. Mickell says Florida law applies, and the Plan does not

11

dispute this.   However, the Plan Documents say it will be "administered, construed, and enforced according to the laws of the State of New York."  See Buce v. Allianz Life Ins. Co., 247 F.3d 1133, 1149 (11th Cir. 2001) ("Where a choice of law is made by an ERISA contract, it should be followed, if not unreasonable or fundamentally unfair." (quotation marks omitted)).  We will therefore look to New York law.

"As with the construction of contracts generally, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court."  Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 37 N.E.3d 78, 80 (N.Y. 2015) (quotation marks omitted).  A contract is ambiguous "when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or where its terms are subject to more than one reasonable interpretation."  Id. (quotation marks and internal citations omitted).  "[T]he test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech."  Id. at 81 (quotation marks omitted).

Applying these principles to the Disability definition, the Plan says a player "will be deemed to be totally and permanently disabled" if (1) "he is substantially prevented from or substantially unable to engage in any occupation or employment

12

for remuneration or profit" and (2) "such condition is permanent." This provision

sets out the baseline definition of Disability. But the Plan Documents also contain

a second provision: a player "will not be considered to be able to engage in any

occupation or employment for remuneration or profit" simply because he "receives

up to $30,000 per year in earned income." We read the second provision as saying

a player will not be barred from being considered disabled simply because he

makes $30,000 in annual income. In other words, a player may still be deemed

disabled even if he receives up to $30,000 in income. Contrary to Mr. Mickell's

interpretation, the second provision does not "limit[]" the first. The plain language

of the Plan Documents therefore does not require the Board to first find that a

player-applicant could earn more than $30,000 a year. Thus, the Board did not err

in its interpretation and application of the Disability standard defined by the Plan.

B. THE BOARD ABUSED ITS DISCRETION WHEN IT DID NOT CONSIDER
   RELEVANT EVIDENCE SUBMITTED BY MR. MICKELL.

When reviewing an ERISA benefits denial under an abuse of discretion

standard, "the function of the court is to determine whether there was a reasonable

basis for the decision, based upon the facts as known to the administrator at the

time the decision was made." Glazer v. Reliance Std. Life Ins. Co., 524 F.3d 1241,

1246 (11th Cir. 2008) (quotation marks omitted). "Giving more weight to the

opinions of some experts than to the opinions of other experts is not an arbitrary or

capricious practice." Slomcenski v. Citibank, N.A., 432 F.3d 1271, 1279–80 (11th

13

Cir. 2005). We must uphold the Plan's determination "if it has a reasonable factual basis, even if the record also contains contrary information." Id. at 1280.

Mr. Mickell claims the Plan ignored the evidence he submitted and "reflexively deferred to the employability conclusions of its hired evaluators." He points to the Plan's denial letters, which referenced conflicting evidence, and notes the absence of any discussion of that conflict. We are aware, of course, that conflicting evidence is a proper basis on which to deny benefits. See Shaw, 353 F.3d at 1287. Yet Mr. Mickell says the denial letters discounted all the favorable evidence he submitted. Indeed, the Plan's argument on appeal relies on its seven experts and the conflicting evidence, but disregards Mr. Mickell's argument that the Board ignored the evidence of his "MRI reports, x-rays reports, hospital records, injury reports, and treating physicians' records."

In determining whether to grant or deny Mr. Mickell's initial claim, the Committee had a number of documents before it. Among other things, it had the reports of three Plan Neutral Physicians, Dr. Macciocchi, Dr. McCasland, and Dr. Arlosoroff; Mr. Mickell's medical records; and reports Mr. Mickell submitted from his treating physicians, Dr. Todd and Dr. Lichtblau. The Committee found that Mr. Mickell did not meet the definition of Disability because three Plan Neutral Physicians "indicated that [he is] employable." The Committee was free to give

14

more weight to the Plan Neutral Physicians' opinions than Mr. Mickell's experts.
See Slomcenski, 432 F.3d at 1279–80.

However, in deciding Mr. Mickell's appeal of the Committee's decision, the
Board wholly failed to consider record evidence that contradicted the opinions of
the Plan Neutral Physicians.  The Board said it "reviewed [Mr. Mickell's] entire
file," but that statement is belied by the record.  The minutes for the Board's
meeting contain an itemized list of materials the Board reviewed in deciding Mr.
Mickell's claim.  The only evidence listed are documents submitted after the
Committee's September 8, 2014, denial.  The list does not include evidence that
was previously before the Committee.  Neither does the Board's denial letter
discuss any evidence Mr. Mickell submitted to the Committee, like, for example,
the opinions of Dr. Todd and Dr. Lichtblau.  When it failed to review relevant
medical evidence that supported Mr. Mickell's claim, the Board abused its
discretion.  See Oliver v. Coca Cola Co., 497 F.3d 1181, 1199 (11th Cir.), vacated
in part on other grounds, 506 F.3d 1316 (11th Cir. 2007) (holding the plan
administrator acted arbitrarily and capriciously when it "simply ignored relevant
medical evidence in order to arrive at the conclusion it desired").

## C. THE BOARD ABUSED ITS DISCRETION BY FAILING TO CONSIDER THE CUMULATIVE EFFECTS OF MR. MICKELL'S IMPAIRMENTS.

Mr. Mickell's final argument is that the Board unreasonably assessed his
conditions when it "fail[ed] to consider the cumulative effect of his physical,

15

cognitive, and psychological symptoms on his functionality." The Plan's response to this argument is to say that the District Court was right to find the Plan Neutral Physicians properly limited their conclusions to areas within their expertise, and this supported the reliability of their reports. We agree with Mr. Mickell that the Board abused its discretion by failing to consider the combined effects of all of his impairments.

We note that the Plan Documents do not place any burden of proof on Mr. Mickell to prove is disability. Rather, the onus is on the Committee or the Board to "find[] . . . that he has become totally disabled." The Committee or the Board must decide if a player meets the definition of Disability by requiring the player "to submit to an examination" "[w]henever" it reviews a player's application. Mr. Mickell was thus not responsible for telling the Committee or the Board how its Plan Neutral Physicians should evaluate him or how they should analyze his claim. Cf. Melech v. Life Ins. Co. of N. Am., 739 F.3d 663, 673 (11th Cir. 2014) (explaining that, because the plan put the burden of proof on the plaintiff, "neither ERISA nor the Policy required [the plan administrator] to ferret out evidence").

The Board cannot prevail based on its claim that the Plan Neutral Physicians properly limited their conclusions to areas within their expertise. The Board could have easily required Mr. Mickell to "submit to an examination" by a vocational expert, who could have provided an opinion about whether Mickell's specific

16

impairments—when considered together—prevented his gainful employment. See, e.g., Bowen v. Yuckert, 482 U.S. 137, 164, 107 S. Ct. 2287, 2303 (1987) (Blackmun, J., dissenting) (discussing vocational evaluations of Social Security claimants and explaining that a disabled person's employability is about more than the effects of individual impairments). The Plan argues that neither the Plan Documents nor any court requires a claimant to undergo a functional capacity evaluation. Perhaps this is true in a vacuum. However, when it denied Mr. Mickell's claim, the Board and the District Court relied on Dr. Faber's opinion that, despite Mickell's depression and anxiety, his psychological difficulties do not "'rise to a level that precludes some kind of employment' such as 'assisting in sports programs for youths.'" Dr. Faber performed no tests to determine whether Mr. Mickell had the physical ability to work in a position like that. However, Mr. Mickell's treating physician, Dr. Lichtblau, did. Dr. Lichtblau opined that because Mr. Mickell "does not have the functional capacity to work 4 hours per day on an uninterrupted basis at this time," he "will be unable to maintain gainful employment." The Board credited Dr. Faber's opinion, but in light of its failure to even consider it alongside Dr. Lichtblau's opinion, as discussed above, the Board abused its discretion.

Even though we review the Board's determination under a deferential standard, the standard does not render us a mere stamp of approval. On the

contrary, we review the decision for whether the Board "entirely failed to consider an important aspect of the problem." BBX Cap. v. Fed. Deposit Ins. Corp., 956 F.3d 1304, 1314 (11th Cir. 2020) (quotation marks omitted). Because the Board failed to consider the combined effect of Mr. Mickell's many physical and mental impairments, it ignored an important consideration in the question of whether he was disabled. On remand, the District Court should consider all evidence of Mr. Mickell's conditions together, including any evidence of Mr. Mickell's functional capacity, to determine whether the combined effects of his impairments render him disabled.[4]

## IV.  CONCLUSION

Because the Board abused its discretion by failing to consider (1) Mr. Mickell's medical records and reports from his treating physicians, and (2) the cumulative effect of Mickell's impairments, we **REVERSE** the District Court's

---

[4] Our decision in favor of Mr. Mickell is in keeping with decisions from several other circuits recognizing that all of a claimant's conditions, or all of the symptoms from his conditions, should be evaluated together. See, e.g., Fletcher-Merrit v. NorAm Energy Corp., 250 F.3d 1174, 1177, 1179 (8th Cir. 2001) (upholding denial of benefits based on plan administrator's determination that "there was no evidence to support that the combination of [claimant's] conditions or symptoms that would restrict her from working"); DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 873 (4th Cir. 2011) (holding as arbitrary plan administrator's reliance on hired expert's report, which did not support "a conclusion that the symptoms from [claimant's] fibromyalgia, either by themselves or combined with the symptoms from her other conditions, are not sufficiently severe"); Miller v. Am. Airlines, Inc., 632 F.3d 837, 853 (3d Cir. 2011) (overturning plan administrator's decision for failing to discuss anxiety diagnosis because the "failure to take into account multiple documented diagnoses suggests that a denial of benefits was not the product of reasoned decision-making"); Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos., 419 F.3d 501, 510 (6th Cir. 2005) (calling plan administrator's reliance on expert report that did not discuss "interrelated effects" of heart condition and depression questionable).

18

order granting summary judgment to the Plan.  We **REMAND** this case to the

District Court for further proceedings consistent with this opinion.