FILED
United States Court of Appeals
Tenth Circuit

February 20, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JOSEPH M. HOSKINS,

    Plaintiff - Appellant,

v.

JARED WITHERS; JESS L.
ANDERSON,

    Defendants - Appellees.

No. 22-4081

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:20-CV-00749-HCN)**
_____

Karra J. Porter, Christensen & Jensen (Anna P. Christiansen, Christensen
& Jensen, P.C., with her on the briefs), Salt Lake City, Utah, for Plaintiff-
Appellant.

J. Clifford Petersen, Assistant Utah Solicitor General, Utah Attorney
General's Office, Salt Lake City, Utah, for Defendant-Appellees.
_____

Before **BACHARACH**, **PHILLIPS**, and **EID**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

This appeal grew out of a traffic stop during Mr. Joseph Hoskins's

drive through Utah in November 2018. Mr. Hoskins's car had an Illinois

license plate, but the lettering was partially obstructed. Though the stop began uneventfully, it quickly escalated when the trooper (Jared Withers) directed a trained narcotics dog to sniff the car. Tempers flared; and Trooper Withers took Mr. Hoskins's cell phone, pointed a gun at him, applied handcuffs, patted him down, and searched his car. The trooper found a large amount of cash and arrested Mr. Hoskins.

The traffic stop, dog sniff, search, and arrest led Mr. Hoskins to sue Trooper Withers for violating the First and Fourth Amendments.[1] These claims trigger seven issues:

1. **The traffic stop.** The trooper could conduct a traffic stop only if he had reasonable suspicion to believe that Mr. Hoskins had violated Utah law. A Utah law required maintenance of license plates to keep the lettering legible. But did the Utah law apply to license plates issued in other states? We answer *yes*.

2. **Prolonging of the traffic stop.** After stopping the car, the trooper could ask the driver for proof of insurance. But the trooper couldn't prolong the traffic stop to investigate the possibility of a crime. But what happens if the driver couldn't find the proof of insurance? The trooper could ask the driver to look. While the driver was looking could the trooper conduct a dog sniff outside the car? We answer *yes*.

3. **Reasonableness of protective measures during an investigative detention.** After the stop became confrontational, the trooper decided to search the car and detain the driver. At some point, the restraint could elevate the detention into an arrest. But when the driver reacted angrily and positioned his hands in or near his pockets, could the trooper reasonably believe that he wasn't elevating the stop into an arrest when he

---

[1] Mr. Hoskins also claimed violation of the state constitution, but these claims aren't at issue.

pointed a gun, handcuffed the driver, conducted a patdown, and put the driver in the patrol car? We answer *yes*.

4.  **Arguable probable cause to search the car**. A trained narcotics dog's reaction to the presence of drugs can establish probable cause to justify a search of a car. When a trained dog tries to leap into a car, does that reaction create at least arguable probable cause to conduct a search? We answer *yes*.

5.  **Arguable probable cause to arrest the driver.** The search led to the discovery of a large amount of cash hidden in the car. Did the trooper obtain arguable probable cause to arrest the driver based on the dog's reaction and the presence of the cash? We answer *yes*.

6.  **Lack of a clearly established violation for retaliatory use of force.** We've never held that the Constitution prohibits an officer from pointing a gun at suspects when there's probable cause to believe that they're committing a felony. Given the absence of such a holding, did the trooper violate a clearly established constitutional right by pointing a gun at the driver to retaliate for protected speech? We answer *no*.

7.  **Lack of a clearly established violation involving excessive force.** When a serious crime is suspected, we've held that the Fourth Amendment doesn't prohibit a law-enforcement officer from pointing a gun at the suspect. Given that holding, did the trooper violate a clearly established constitutional right by pointing a gun at the driver when he reacted angrily and positioned his hands in or near his pockets? We answer *no*.

Mr. Hoskins also sued Mr. Jess Anderson, Commissioner of the Utah Department of Public Safety, claiming a violation of the Fourteenth Amendment's due process clause. This claim arose after the confrontation between Mr. Hoskins and Trooper Withers. That confrontation resulted in the arrest of Mr. Hoskins, which in turn led to the taking of a DNA sample. Despite the arrest, authorities never charged Mr. Hoskins; so Utah law

3

required destruction of the DNA sample. But Mr. Hoskins allegedly had no way to learn whether authorities had destroyed the DNA sample. Would the alleged inability to verify compliance with state law constitute a denial of due process? We answer *no*.

## Background

**1.    Mr. Hoskins is stopped with a large amount of cash hidden inside his car.**

When Trooper Withers conducted the traffic stop, he and Mr. Hoskins looked at the license plate. As they looked, Trooper Withers requested Mr. Hoskins's proof of insurance. Mr. Hoskins said that his insurance information "should be in an email" on his phone, and Trooper Withers asked Mr. Hoskins to sit in the patrol vehicle to answer questions while he looked for the proof of insurance.

In the patrol vehicle, Trooper Withers put Mr. Hoskins's information into a computer. While Mr. Hoskins continued looking for his proof of insurance, Trooper Withers called dispatch and asked for someone to check on the status of the driver's license and the existence of outstanding warrants.

While waiting for dispatch to respond, Trooper Withers took a trained narcotics dog to sniff the outside of Mr. Hoskins's car. During the sniff, the dog leaped and clawed at the front passenger door and tried twice

to enter Mr. Hoskins's car through an open window. Trooper Withers commented that the dog was trying to follow the smell of drugs.

Based on the dog's reaction, Trooper Withers decided to search Mr. Hoskins's car. At Trooper Withers's instructions, Mr. Hoskins got out of the patrol vehicle and put his cell phone on the vehicle's hood.

Trooper Withers said that he was going to search the car and told Mr. Hoskins where to stand. After Mr. Hoskins went to the designated spot, Trooper Withers learned that the driver's license was valid and no outstanding warrants existed.

Trooper Withers walked toward the designated spot. As he approached, he noticed that Mr. Hoskins was holding a second cell phone. Trooper Withers took the cell phone from Mr. Hoskins and turned away. In response, Mr. Hoskins repeatedly cursed at Trooper Withers and positioned his hands in or near his pockets. Trooper Withers quickly turned around, pointed his gun at Mr. Hoskins, and ordered him to keep his hands out of his pockets. The trooper kept the gun pointed for roughly eight seconds as Mr. Hoskins raised his arms.

Trooper Withers then put his gun away, handcuffed Mr. Hoskins, conducted a patdown, and returned him to the patrol vehicle. Trooper Withers and another officer then searched Mr. Hoskins's car. The officers found roughly $89,000 in cash, which was doubled-wrapped in plastic, vacuum sealed, and hidden in the lining between the trunk and a rear seat.

5

Trooper Withers arrested Mr. Hoskins, and jail personnel collected Mr. Hoskins's DNA. But no one pressed charges, and authorities released Mr. Hoskins.

**2.    Mr. Hoskins sues, and the district court dismisses the action.**

Mr. Hoskins sued under 42 U.S.C. § 1983, and the defendants successfully moved to dismiss. The court ruled that

- Trooper Withers hadn't violated the Constitution by making the traffic stop, conducting a dog sniff, pointing a gun, conducting a patdown, applying handcuffs, searching Mr. Hoskins's car, or arresting Mr. Hoskins, and

- Mr. Anderson hadn't violated the Constitution by failing to provide a way to ensure destruction of the DNA sample.

**3.    Our de novo review includes consideration of the video.**

We conduct de novo review over the dismissal. *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014). In conducting this review, we credit "all well-pleaded factual allegations in the . . . complaint" and view the allegations in a light favorable to Mr. Hoskins. *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006) (quoting *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). The parties agree, however, that we can also consider the video from Trooper Withers's body camera.

**Issues Involving Trooper Withers**

**1.    We decide whether Trooper Withers is entitled to qualified immunity based on a two-part test.**

Because Trooper Withers had asserted qualified immunity, Mr. Hoskins needed to show that (1) the trooper violated a federal statutory or constitutional right and (2) the unlawfulness of the conduct was "clearly established at the time." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

When we consider qualified immunity through a motion to dismiss, we apply the plausibility standard set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *Brown v. Montoya*, 662 F.3d 1152, 1162–63 (10th Cir. 2011). Under *Iqbal* and *Twombly*, the complaint must contain enough allegations of fact to state a facially plausible claim. *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

**2.    The Fourth Amendment wasn't violated by the traffic stop or dog sniff.**

For the claims involving the traffic stop and dog sniff, the district court reasoned that

- the video from Trooper Withers's body camera had shown reasonable suspicion for the traffic stop and

- the dog sniff had not prolonged the traffic stop.

We agree with these rulings.

7

**A.     The initial traffic stop was justified.**

Mr. Hoskins challenges the traffic stop, arguing that he didn't violate Utah law. But Utah law requires individuals to maintain their license plates in a legible manner, and Mr. Hoskins's license plate was partially obstructed.[2] That obstruction led Trooper Withers to suspect a violation of Utah law. Trooper Withers could conduct a traffic stop if his suspicion had been reasonable. *Swanson v. Town of Mountain View, Colo.*, 577 F.3d 1196, 1201 (10th Cir. 2009). The reasonableness of the suspicion entails an objective inquiry. *Id.*

In conducting that objective inquiry, we regard Trooper Withers's suspicion as reasonable. Utah law requires maintenance of license plates to keep the lettering legible. *See* Utah Code Ann. § 41-1a-404(3)(b)(ii) ("[Every] license plate shall at all times be . . . maintained . . . in a condition to be clearly legible."). A trooper could reasonably suspect a violation because the frame of the license plate was covering part of the lettering of the state (Illinois). Because the state's lettering was partially covered, Trooper Withers had a reasonable basis to suspect a violation of Utah's legibility requirements.

---

[2]     In the complaint, Mr. Hoskins admitted that the lettering on the license plate was partially obscured. Appellant's App'x at 70.

8

Mr. Hoskins argues that Utah's legibility requirement applies only to license plates issued in Utah. We rejected this argument in *United States v. Echkart*, concluding that a driver had violated Utah law when his California license plate wasn't "clearly visible or legible." 569 F.3d 1263, 1271–72 (10th Cir. 2009).

In *Eckhart*, the defendant hadn't questioned the applicability of the Utah law on drivers from other states. But the Court decided the issue anyway, and we're bound by that decision. *See Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) (stating that we're bound by a panel's interpretation of state law unless the state's highest court later resolved the issue). Mr. Hoskins's arguments do not allow us to skirt *Eckhart*'s interpretation of Utah law. *Thompson v. Weyeshaeuser Co.*, 582 F.3d 1125, 1130 (10th Cir. 2009); *see also United States v. Baker*, 49 F.4th 1348, 1358 (10th Cir. 2022) (concluding that the presentation of a new argument doesn't allow us to deviate from a prior panel opinion).[3]

---

[3]     Some other circuits also consider panel precedents as binding even when a party presents arguments not made to the prior panel. *See Tippitt v. Reliance Standard Life Ins.*, 457 F.3d 1227, 1234 (11th Cir. 2006) (stating that the court of appeals was bound by panel precedent even when the appellant makes arguments not considered by the prior panel); *Harris v. Epoch Grp.*, 357 F.3d 822, 826 (8th Cir. 2004) (stating that "precedents do not cease to be authoritative merely because counsel in a later case advance a new argument" (quoting *United States v. Hill*, 48 F.3d 228, 232 (7th Cir. 1995))); *In re Penn Central Transp. Co.*, 553 F.2d 12, 15 (3d Cir. 1977) (stating that a precedent controls even when an appellant makes an argument not considered by the prior panel).

We would follow *Eckhart* even if we were free to consider Mr. Hoskins's argument for limiting the scope of the Utah law. The Utah law does not say anything to restrict the legibility requirement to license plates issued in Utah. To the contrary, the law uses the passive voice, requiring license plates to "be maintained" in a legible condition. Utah Code Ann. § 41-1a-404(3)(b)(ii). The passive voice reflects a statutory focus on how the license plate is maintained—not where it had been issued. *See Dean v. United States*, 556 U.S. 568, 572 (2009) (stating that a use of passive voice reflects a focus on the existence of an event rather than a specific actor's culpability).

We addressed similar statutory language in *United States v. DeGasso*, 369 F.3d 1139 (10th Cir. 2004). There we considered whether Oklahoma's legibility requirement applies when the driver's license plate had been issued in another state. *Id.* at 1145. We concluded that

- the first paragraph of the Oklahoma statute (directed to the Oklahoma Tax Commission) applied only to vehicles registered in Oklahoma and

- the second paragraph (mandating that the license plate be "clearly visible at all times") applied regardless of where the license plate had been issued.

*Id.* at 1147. For the second conclusion, we reasoned in part that police officers must identify vehicles regardless of where the license plate had been issued. *Id.*; *accord United States v. Ledesma*, 447 F.3d 1307, 1313 (10th Cir. 2006) (holding that a similar Kansas statute requires legibility of

10

license plates for vehicles driven in Kansas even when licensed in another state); *cf. United States v. Simpson*, 520 F.3d 531, 536 (6th Cir. 2008) (concluding that Tennessee's statutory requirement on legibility applies to out-of-state license plates, in part because the legislative purpose "would surely be frustrated" if drivers from other states could avoid ready identification when driving on Tennessee highways).

Our reasoning in *DeGasso* applies here. Like the Oklahoma statute in *DeGasso*, some subsections of the Utah statute arguably apply only when the license plate is displayed where it was issued. *See, e.g.*, Utah Code Ann. § 41-1a-401(3) (governing the physical characteristics of license plates, such as the reflective material on the plate face, issued to Utah registrants); Utah Code Ann. § 41-1a-402 (regulating the design of Utah-issued license plates). But the provision here bears no such limitation. This provision expressly applies to the maintenance of all license plates on vehicles using Utah roads. Utah Code Ann. § 41-1a-404(3).

Mr. Hoskins argues that even if the license plate had violated Utah law, authorities rarely stopped anyone for a violation. But if Mr. Hoskins had been violating Utah law, it wouldn't matter whether a law-enforcement officer would generally stop someone for a violation. *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).[4]

---

[4]    There we said that "[i]t is irrelevant, for purposes of Fourth Amendment review, 'whether the stop in question is sufficiently ordinary

Mr. Hoskins bases his argument on case law involving retaliatory arrests. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019). Under this case law, officers don't incur liability for retaliatory arrest if they had probable cause for the arrest. *Id.* at 1722, 1724. An exception exists when officers wouldn't typically make an arrest even with probable cause. *Id.* at 1727. But Mr. Hoskins doesn't claim retaliatory arrest.

Granted, Mr. Hoskins elsewhere alleges protected speech and denies the existence of probable cause. But these allegations don't bear on a trooper's right to stop a driver for violating Utah's equipment law. *See United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000) (stating that an officer can stop a driver for reasonable suspicion involving violation of a state's equipment law). So Trooper Withers could stop Mr. Hoskins even if Utah drivers had frequently driven with obstructed license plates.

**B.    The dog sniff didn't prolong the traffic stop.**

Reasonable suspicion would thus allow Trooper Withers to stop Mr. Hoskins. To carry out the stop, the trooper could check Mr. Hoskins's driver's license, determine whether outstanding warrants existed, and inspect the proof of insurance. *Rodriguez v. United States*, 575 U.S. 348,

---

or routine according to the general practice of the police department or the particular officer making the stop.'" *Botero-Ospina*, 71 F.3d at 787 (quoting *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993)).

355 (2015). But Trooper Withers couldn't prolong the traffic stop to investigate the possibility of a crime. *Id.* at 353–55.

Mr. Hoskins argues that Trooper Withers prolonged the traffic stop by conducting the dog sniff. We disagree. Trooper Withers didn't begin the dog sniff until he had already asked dispatch to check on warrants for Mr. Hoskins and the status of his driver's license. And when Trooper Withers finished the dog sniff, Mr. Hoskins was still looking for his proof of insurance and dispatch had not yet reported on the existence of outstanding warrants or the status of the driver's license.[5] So the dog sniff did not extend the time of the traffic stop.

We addressed similar circumstances in *United States v. Cates*, 73 F.4th 795 (10th Cir. 2023), *cert. pet. filed*, No. 23-5903 (U.S. Oct. 27, 2023). There a state trooper had stopped a motorist for speeding in a rental car. *Id.* at 799–800. The trooper asked for the rental contract, and the driver looked for it. While he looked, the trooper told another officer to conduct a dog sniff. The second officer finished the dog sniff before the driver could find his rental contract. *Id.* at 807. We thus concluded that the dog sniff hadn't prolonged the traffic stop. *Id.* at 804.

---

[5]    In the complaint, Mr. Hoskins alleged that the dog sniff had taken about a minute. Appellant's App'x at 83 ¶ 51.

Under *Cates*, Trooper Withers's dog sniff did not prolong Mr. Hoskins's traffic stop. In *Cates*, the driver was still looking for the rental contract when the dog sniff ended. And here, the trooper finished the dog sniff while Mr. Hoskins was still looking for his proof of insurance. In both *Cates* and our case, the traffic stop would have taken the same amount of time with or without the dog sniff. *See United States v. Mayville*, 955 F.3d 825, 833 (10th Cir. 2020) ("Because the dog sniff and alert were contemporaneous with the troopers' reasonably diligent pursuit of the stop's mission, the subsequent search . . . did not violate [the defendant's] Fourth Amendment rights.").

Mr. Hoskins questions the applicability of *Cates*, arguing that Trooper Withers waited too long to contact dispatch. But even if Trooper Withers had contacted dispatch earlier, the traffic stop would have taken just as long because Mr. Hoskins would still have been looking for his proof of insurance. So even if the trooper had contacted dispatch earlier, the dog sniff wouldn't have prolonged the traffic stop.[6]

---

[6] Mr. Hoskins also alleges that the trooper delayed the stop by asking questions unrelated to the equipment violation. "But an officer's mission during a traffic stop is not limited to determining whether to issue a ticket." *United States v. Cone*, 868 F.3d 1150, 1153 (10th Cir. 2017). And Mr. Hoskins doesn't say which questions were problematic or why those questions exceeded the scope of the trooper's mission. We thus lack a meaningful argument to consider.

14

3.    **Asking Mr. Hoskins to sit in the patrol car did not turn the detention into an arrest.**

Mr. Hoskins argues that when he was forced to sit in the patrol car, the stop escalated into an arrest. We disagree. A stop doesn't escalate into an arrest if the detention is reasonably related to the circumstances justifying the stop. *United States v. Muldrow*, 19 F.3d 1332, 1335–36 (10th Cir. 1994).

The video shows that

- Mr. Hoskins needed to look on his cell phone for his proof of insurance and

- Trooper Withers ultimately called dispatch from the patrol car.

In these circumstances, Trooper Withers could reasonably maintain safety by asking Mr. Hoskins to sit in the patrol car.

Many other circuits have concluded that an order to sit in a police car doesn't automatically turn a detention into an arrest. *See United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996) ("Detention in a police car does not automatically constitute an arrest."); *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987) (concluding that detention in a patrol car did not turn the seizure into an arrest); *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006) (concluding that placement of the driver in a patrol car did not turn a traffic stop into an arrest); *United States v. Parr*, 843 F.2d 1228, 1230 (9th Cir. 1988) ("Certainly, there is no per se rule that detention in a patrol car constitutes an arrest."). These cases make

15

sense here. Trooper Withers asked Mr. Hoskins to sit in the patrol car, and Mr. Hoskins complied with the request. By asking Mr. Hoskins to join him in the patrol car, Trooper Withers was continuing to carry out the mission of the traffic stop. We thus conclude that the trooper didn't turn the traffic stop into an arrest by asking Mr. Hoskins to sit in the patrol car.

**4.    The dog's reaction created arguable probable cause to search the car.**

Trooper Withers and another officer searched Mr. Hoskins's car. For that search, the officers needed probable cause to believe that the car contained contraband. *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012). But even if the officers had lacked probable cause, they would incur personal liability only if they had violated a clearly established right. *Camreta v. Greene*, 563 U.S. 692, 705 (2011); *see* p. 7, above.

Though the district court didn't rely on the absence of a clearly established right, we can affirm on any ground adequately supported by the record. *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004). In deciding whether to consider affirmance on a different ground, we address

- whether the issue was briefed in district court and on appeal,
- whether the issue is legal or factual, and
- whether the record is adequately developed.

*Id.* at 1162.

16

The issue was fully briefed in district court and on appeal, and the clearly established nature of a right entails a question of law. *Garrett v. Stratman*, 254 F.3d 946, 951 (10th Cir. 2001). On that legal question, the district court was bound by the allegations in the complaint and the video from Trooper Withers's body camera. *See* p. 6, above. So the record was fully developed. We thus exercise our discretion to consider Trooper Withers's argument that any constitutional violation wouldn't have been clearly established.

We ordinarily consider a right clearly established only "when it's apparent from a precedent or the clear weight of authority from other courts." *Williams v. Hansen*, 5 F.4th 1129, 1132 (10th Cir. 2021). But even without an applicable precedent or consensus of case law, a right can be clearly established when it is obvious. *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam).

We determine whether Trooper Withers violated a clearly established right by considering whether probable cause was at least arguable. *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014). Probable cause was arguable if Trooper Withers had an objectively reasonable belief that probable cause existed (even if that belief was mistaken). *Id.* In our view, Trooper Withers could reasonably believe that the dog sniff had created probable cause.

17

A trained narcotics dog can react to drugs through either an *alert* or an *indication*. An *alert* takes place when the dog reacts to a known odor by changing body posture and increasing respiration. *United States v. Forbes*, 528 F.3d 1273, 1275 n.3 (10th Cir. 2008). An *indication* involves other behavioral changes that show the precise location of the drugs. *Id.* For example, a dog might signal the location of the drugs by staring, sitting, scratching, biting, or barking. *Id.*

A trained narcotics dog's *alert* or an *indication* is enough to create probable cause for a search. *See United States v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009). So we must assess the objective reasonableness of Trooper Withers's belief that the dog had alerted or indicated. For that determination, we credit the allegations in the complaint. *See* p. 6, above. But the parties agree that we can supplement those allegations with the video of the dog sniff. *See* p. 6, above.

The video shows that the dog tried twice to leap into an open window. After the first effort, Trooper Withers commented that the dog was "following an odor right into the car." Bodycam 2:37:45, 2:37:55. After the dog tried again to leap into the car, the trooper said that he regarded the dog's behavior as an *indication*. Bodycam 2:38:00. Even if the trooper had been wrong, however, his characterization was at least reasonable because the dog had tried to leap into the car's open window.

18

When the dog sniff took place, we had characterized similar reactions from trained narcotics dogs as enough for probable cause. *See United States v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009) (upholding the district court's finding that a dog had *alerted* when it stiffened, breathed heavily, and tried to jump into the window on the driver's side); *United States v. Woods*, 351 F. App'x 259, 263 (10th Cir. 2009) (unpublished) (stating that a dog had *alerted* when it stopped twice to smell a particular spot and stuck its head into the window on the passenger side); *United States v. Gavilanas-Medrano*, 479 F. App'x 166, 171 (10th Cir. 2012) (unpublished) (upholding the finding of an *alert* when a dog had stood on its hind legs and sniffed along the seam of the windshield and hood).[7]

Mr. Hoskins questions the significance of the dog's second effort to leap into the car, downplaying the significance of the reaction and arguing that Trooper Withers had given an audible command for the dog to react.[8] The video does show that the trooper made a sound before the dog tried to leap into the car for a second time. But before the trooper made this sound,

---

[7]    Though two of these cases aren't precedential, they show that a trooper could reasonably infer probable cause from the dog's reaction. *See Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018) ("[A]n unpublished opinion can be quite relevant in showing that the law was *not* clearly established." (emphasis in original)).

[8]    Mr. Hoskins doesn't allege in the complaint that the trooper gave a command for the dog to react.

the dog had already tried to leap into the car's open window. So probable cause was at least arguable even if we disregard the dog's second effort to leap into the car.

**5.    Trooper Withers didn't violate a clearly-established right by conducting protective measures prior to the search.**

Though Trooper Withers had arguable probable cause to search the car, he doesn't suggest that he had enough information to make an arrest until he searched the car. So the timing of the arrest matters. Mr. Hoskins alleges that he had been arrested prior to the search of his car; Trooper Withers argues that he didn't make the arrest until after he had conducted the search.

The required probable cause differs for search of a car and for an arrest. For an arrest, probable cause exists when reasonably trustworthy sources alert an officer to facts and circumstances that would warrant a person of reasonable caution to believe that an offense has been committed or is being committed. *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995). For a car search, probable cause exists if the totality of the circumstances create a fair probability that the car contains contraband or evidence of a crime. *United States v. Nielsen*, 9 F.3d 1487, 1489–90 (10th Cir. 1993).

We can assume, for the sake of argument, that Mr. Hoskins is correct in alleging an arrest prior to the search of his car. Even with this

20

assumption, Trooper Withers asserts qualified immunity, arguing that the case law wouldn't have clearly established the escalation of his investigative detention into an arrest.

Though the district court didn't address this argument, it was fully briefed here and in district court. And the issue is legal, rather than factual, without the need for any further development of the record. So we can address Trooper Withers's argument to affirm based on the lack of a clearly established right. *See* p. 17, above.

We assess the clarity of the right based on the line between an investigative detention and arrest. Drawing that line is fact-intensive without the benefit of bright-line rules. *See Hemry v. Ross*, 62 F.4th 1248, 1254 (10th Cir. 2023) ("We conduct a fact-intensive inquiry to distinguish between arrests and *Terry* stops."); *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002) ("The allowable scope of an investigative detention cannot be determined by reference to a bright-line rule[.]"). Instead of a bright-line rule, we ask whether a reasonable officer could consider the restraints to fall within the scope of detention. *Manzanares v. Higdon*, 575 F.3d 1135, 1150 (10th Cir. 2009).

On this question, Mr. Hoskins needed to show clear establishment of "an unconstitutional arrest as opposed to a lawful investigative detention." *Soza v. Demsich*, 13 F.4th 1094, 1100–01 (10th Cir. 2021). To satisfy this burden, Mr. Hoskins alleges escalation of the restraint by taking his second

cell phone, pointing a gun, applying handcuffs, conducting a patdown, and putting him in the patrol car.[9]

Mr. Hoskins points out that without the cell phone, he couldn't record the encounter. But he doesn't otherwise suggest that confiscation of the cell phone would have elevated the encounter into an arrest. And he didn't suggest in district court that the confiscation of his cell phone would have elevated the detention into an arrest.

After Trooper Withers took the second cell phone, Mr. Hoskins reacted angrily and cursed. Trooper Withers turned around and saw Mr. Hoskins with his hands in or near his pockets. At this point, Trooper Withers could reasonably fear that Mr. Hoskins was going to pull out a handgun.

Until then, the encounter had proceeded without incident: The two men had looked at the license plate, discussed the legal requirement for unobstructed license plates, and sat together in the patrol car. But the encounter escalated with the dog sniff, as Mr. Hoskins snapped at the

---

[9]    Trooper Withers told Mr. Hoskins that he was being detained, not arrested. But the trooper's statement isn't dispositive. *See Cortez v. McCauley*, 478 F.3d 1108, 1117 n.8 (10th Cir. 2007) (en banc) (stating that the law-enforcement officers' subjective beliefs were irrelevant when they told a suspect that he was not being arrested); *accord United States v. Jackson*, 377 F.3d 715, 717 (7th Cir. 2004) (concluding that a similar statement by a police officer doesn't matter because the inquiry under the Fourth Amendment is objective).

trooper. At this point, Mr. Hoskins had not been patted down.[10] Trooper Withers could thus believe that he needed to act quickly, pointing a gun at Mr. Hoskins in case he was reaching for his own gun.

As Trooper Withers pointed his gun, he told Mr. Hoskins to remove his hands from his pockets. Mr. Hoskins complied, raising his hands; Trooper Withers put his gun away and applied handcuffs. Mr. Hoskins alleges that even if pointing the gun hadn't elevated the detention into an arrest, the handcuffing would have done so.

For this allegation, our case law wouldn't have provided clear guidance to Trooper Withers. Many of our opinions stated that handcuffing a suspect hadn't elevated a detention into an arrest. *United States v. Merkley*, 988 F.2d 1062, 1063–64 (10th Cir. 1993); *United States v. Neff*, 300 F.3d 1217, 1218–21 (10th Cir. 2002); *United States v. Albert*, 579 F.3d 1188, 1191, 1193–95 (10th Cir. 2009); *United States v. Salas-Garcia*, 698 F.3d 1242, 1249–52 (10th Cir. 2012). Of course, we had also held the opposite many times. *United States v. Melendez-Garcia*, 28 F.3d 1046,

---

[10]     In the complaint, Mr. Hoskins pointed out that he had lifted his shirt to reveal his waistband. Appellant's App'x at 88 ¶ 96(a). Though he didn't have a weapon in his waistband, he could have had a weapon in his pockets or socks. So a reasonable officer could have believed that a patdown was necessary to prevent the possibility that Mr. Hoskins was carrying a weapon in his pockets or socks. *See United States v. Belin*, 868 F.3d 43, 50–51 (1st Cir. 2017) (concluding that a frisk was permissible because the suspect's clothing prevented the officer from visually determining whether the suspect had a firearm).

1051–53 (10th Cir. 1994); *Manzanares v. Higdon*, 575 F.3d 1135, 1148–49 (10th Cir. 2009); *Lundstrom v. Romero*, 616 F.3d 1108, 1122–23 (10th Cir. 2010).

From our cases, "any reasonable officer would understand that it [was] unconstitutional to handcuff someone absent probable cause or an articulable basis to suspect a threat to officer safety combined with reasonable suspicion." *Manzanares*, 575 F.3d at 1150. But our case law wouldn't have provided Trooper Withers with an easy benchmark to assess the seriousness of the threat. *See Merkley*, 988 F.2d at 1064 (stating that our case law has "eschewed" "bright-line standards" on when handcuffing would elevate a detention into an arrest). So even if the handcuffing had elevated the detention into an arrest, the violation wouldn't have been clearly established.

After Mr. Hoskins was handcuffed, he was patted down. Trooper Withers could view the patdown as a necessary safeguard during the search of the car. To conduct the patdown, Trooper Withers needed only a "minimum level of objective justification," which could fall below the threshold for probable cause or a preponderance of the evidence. *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007) (quoting *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1260 (10th Cir. 2006), and *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Before Trooper Withers conducted the patdown, he had seen Mr. Hoskins reacting angrily with his

hands positioned near or in his pockets. In these circumstances, a trooper could reasonably view the patdown as a necessary safeguard to ensure that Mr. Hoskins wasn't carrying a weapon while the officers searched the car.

After conducting the patdown, Trooper Withers needed to participate in the search, diverting his focus from Mr. Hoskins. So Trooper Withers put Mr. Hoskins in the patrol car. As noted earlier, courts had often held that placement in a patrol car wouldn't automatically turn a detention into an arrest. *See* pp. 15–16. So any violation at this step wouldn't have been clearly established.

We may assume for the sake of argument that the combination of measures turned the detention into an arrest. But a reasonable trooper could easily have found such a conclusion far from obvious based on our case law. In analogous circumstances, we upheld qualified immunity for the officer in *Soza v. Demsich*, 13 F.4th 1094, 1099–1104 (10th Cir. 2021). There the officer had pointed a gun at the suspect, patted him down, and applied handcuffs. *Id.* at 1098, 1100 n.2. Though we had elsewhere held that the measures turned the detention into an arrest, we upheld qualified immunity for the officers because the facts cut both ways on the likelihood of a danger to the officers, the plaintiff hadn't identified a "sufficiently on-point case" to render a constitutional violation clearly established, and the district court and prior Tenth Circuit panel had differed on the reasonableness of the protective measures. *Id.* at 1101–1104.

25

The facts cut both ways here, too, and Mr. Hoskins hasn't identified a prior case recognizing a constitutional violation in similar circumstances. He has cited cases recognizing that unreasonable force ordinarily turns an investigative detention into an arrest. Appellant's Opening Br. at 40 n.191. But he does not suggest that the facts in those cases resemble the facts here. And Trooper Withers pointed a gun, applied handcuffs, and conducted a patdown only after he had seen Mr. Hoskins reacting angrily with his hands positioned in or near his pockets. In these circumstances, a trooper could reasonably regard the protective measures as necessary to ensure safety. We thus affirm the dismissal of this claim based on the absence of a clearly established right.

**6.    In pointing a gun, Trooper Withers didn't violate a clearly established right against retaliation or excessive force.**

Mr. Hoskins claims that the trooper violated the First and Fourth Amendments by pointing the gun. For the First Amendment claim, Mr. Hoskins alleges that the trooper was retaliating for protected speech (cursing at the trooper and complaining that he had allowed the dog to scratch the car). For the Fourth Amendment claim, Mr. Hoskins alleges that pointing the gun constituted excessive force.[11] The district court ruled

---

[11]    Mr. Hoskins also alleged that he had been shoved. But he doesn't argue on appeal that the shoving constituted excessive force.

that the trooper hadn't violated either constitutional amendment by pointing the gun at Mr. Hoskins.

Mr. Hoskins challenges these rulings, and Trooper Withers defends the rulings and argues in the alternative that any constitutional violation wouldn't have been clearly established. We address Trooper Wither's alternative argument because it is fully briefed, legal, and adequately developed. *See* p. 17, above.

### A.    A violation of the First Amendment wouldn't have been clearly established.

To determine whether the right was clearly established, we consider the allegations in the complaint and what we can see from the video. *See* p. 6, above. The video shows that Trooper Withers pointed his gun at Mr. Hoskins for roughly eight seconds, and Mr. Hoskins attributes the pointing of the gun to the trooper's anger for the cursing and complaints about the dog sniff. We can assume for the sake of argument that the cursing and complaints constituted protected speech. Even with this assumption, however, we had no precedents finding a First Amendment violation when an officer points a gun at a suspect to retaliate for protected speech.[12]

---

[12]    When the incident took place, one circuit had held that a retaliatory use of force can violate the First Amendment. *See Coady v. Steil*, 187 F.3d 727, 733–34 (7th Cir. 1999).

27

Even if Trooper Withers had scoured the case law, he might reasonably have concluded that the First Amendment wouldn't prevent him from pointing his gun at Mr. Hoskins in the face of his cursing and complaints. We addressed a similar issue in *Frey v. Town of Jackson, Wyo.*, 41 F.4th 1223 (10th Cir. 2022). There the plaintiff alleged that a law-enforcement officer had unnecessarily applied a wristlock in the Spring of 2018 to retaliate for protected speech. *Id.* at 1230, 1235. We concluded that the officer had qualified immunity based on the absence of any case law that would clearly establish a First Amendment violation from the retaliatory use of force. *Id.* at 1235–36.[13]

We decided *Frey* in 2022, years after the encounter between Trooper Withers and Mr. Hoskins. But *Frey* analyzed the clarity of our case law as of the Spring of 2018, which preceded Trooper Withers's traffic stop by only a few months. Though Trooper Withers didn't have the benefit of *Frey* when he made the traffic stop, our opinion shows that only a few months before Mr. Hoskins was stopped, a retaliatory use of force hadn't been clearly established as a First Amendment violation. We thus affirm

---

[13]    Trooper Withers doesn't cite *Frey*, but we must consider "all relevant case law." *Williams v. Hansen*, 5 F.4th 1129, 1133 (10th Cir. 2021); *see Elder v. Holloway*, 510 U.S. 510, 516 (1994).

the dismissal of this claim based on the absence of a clearly established protection against a retaliatory use of force.[14]

### B.    A violation of the Fourth Amendment wouldn't have been clearly established.

We also uphold the dismissal of Mr. Hoskins's claim under the Fourth Amendment. This claim involves the use of excessive force when the trooper pointed a gun at Mr. Hoskins for roughly eight seconds. Of course, we've found excessive force when officers shoot unarmed and unthreatening suspects. *E.g.*, *Finch v. Rapp*, 38 F.4th 1234, 1243 (10th Cir. 2022). But not when an officer points a gun at a suspect. To the contrary, we've held that the force isn't excessive under the Fourth Amendment when an officer points a gun at an adult suspected of a serious crime. *Henry v. Storey*, 658 F.3d 1235, 1239–41 (10th Cir. 2011).

If Trooper Withers had scoured the case law, he might reasonably have concluded that pointing the gun wouldn't be excessive. We had no

---

[14]    Mr. Hoskins relies on a Supreme Court opinion post-dating the traffic stop: *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019). In *Nieves*, the Supreme Court held that a retaliatory arrest doesn't trigger liability when probable cause existed. *Id.* at 1723. Following *Nieves*, two circuits have held that a law-enforcement officer enjoys qualified immunity for retaliatory arrest when probable cause is at least arguable. *Novak v. City of Parma, Ohio*, 33 F.4th 296, 305 (6th Cir. 2022); *Nieters v. Holtan*, 83 F.4th 1099, 1109–10 (8th Cir. 2023). And we conclude below that probable cause was at least arguable. *See* pp. 31–34, below. But we need not determine whether arguable probable cause would trigger qualified immunity on the retaliation claim because there was no clearly established protection against a retaliatory use of force.

precedents finding excessive force when a law-enforcement officer points a gun at a suspect for a matter of seconds, and a trained dog had already alerted to the odor of illegal drugs in the car. And before the trooper drew his gun, the suspect was cursing with his hands near or in his pockets.[15] Given these circumstances, reasonable law-enforcement officers could reasonably believe that the Fourth Amendment would allow them to point a gun at the suspect for roughly eight seconds.

Mr. Hoskins also contends that the situation became volatile only because Trooper Withers had escalated the conflict by shoving Mr. Hoskins and pointing the gun. But in district court and on appeal, Mr. Hoskins doesn't cite any pertinent case law or explain how a reasonable officer should have recognized a constitutional violation from the shove or display of a gun. We thus uphold the dismissal of the Fourth Amendment claim based on the absence of a clearly established violation. *See Cummings v. Dean*, 913 F.3d 1227, 1243 (10th Cir. 2019) (concluding that the plaintiff's failure to identify a factually similar precedent is fatal in qualified immunity).

---

[15]    The trooper had seen Mr. Hoskins's waistband, but had not done a patdown. *See* note 10, above.

**7.    The search yielded arguable probable cause for an arrest.**

With Mr. Hoskins secured, Trooper Withers and another officer searched the lining between the trunk and back seat and found $89,000 in cash, double-wrapped in plastic and vacuum sealed. Trooper Withers then arrested Mr. Hoskins.

Mr. Hoskins challenges the lawfulness of the arrest. The arrest would have been lawful only if probable cause existed. *United States v. Traxler*, 477 F.3d 1243, 1246 (10th Cir. 2007). Probable cause for an arrest would exist if Trooper Withers had reasonably trustworthy information that would lead a prudent person to believe that Mr. Hoskins was committing a crime or had already committed one. *See* p. 20, above. For the sake of argument, we can assume that probable cause didn't exist when Mr. Hoskins was arrested. Even with this assumption, Trooper Withers urges us to affirm on the ground that any constitutional violation would not have been clearly established. We consider this argument because it's fully briefed, legal, and adequately developed. *See* p. 17, above.

A violation wouldn't be clearly established if probable cause had been at least arguable. *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). Probable cause would have been arguable if reasonable troopers could have believed that probable cause existed. *Id.*

Based on the video, reasonable troopers could believe that they had probable cause to arrest Mr. Hoskins based on

31

- the presence of roughly $89,000 in cash that had been double-wrapped, vacuum sealed, and hidden in the car's lining and

- the dog's leaps when sniffing the car.

Mr. Hoskins argues that a large amount of cash wouldn't be enough, in itself, for probable cause. But even if a lot of cash weren't enough in itself, the amount did provide strong evidence of a connection to the drug trade. *See United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two & 43/100 Dollars ($149,442.43/100)*, 965 F.2d 868, 876–77 (10th Cir. 1992);[16] *accord United States v. Thirty-Nine Thousand Eight Hundred Seventy-Three and No/100 Dollars ($39,873.00)*, 80 F.3d 317, 319 (8th Cir. 1996) (recognizing "that possession of a large amount of cash (here, nearly $40,000) is strong evidence that the cash is connected with drug trafficking"); *United States v. Brooks*, 594 F.3d 488, 495 (6th Cir. 2010) ("Courts have readily acknowledged that large sums of cash are indicative of the drug trade[.]"). There wasn't just a lot of money; it was double-wrapped, vacuum sealed, and hidden in the car's lining.

---

[16]     In district court and on appeal, Mr. Hoskins relies solely on this opinion for the point that a large amount of currency isn't alone sufficient for probable cause. The opinion does state that "a large amount of hidden currency in itself is not enough to establish that the money was furnished or was intended to be furnished in return for drugs[.]" 965 F.2d at 877. But the Court went on to conclude that the large amount of hidden currency "is strong evidence of . . . an illicit connection to drug trafficking." *Id.* The Court thus included the "unusually large amount of hidden currency" as a factor contributing to "probable cause." *Id.*

32

It's possible, of course, that Mr. Hoskins was hiding the cash to protect against theft. But given the way that the cash was packed and hidden, Trooper Withers could doubt an innocent explanation. *See United States v. Orozco*, 41 F.4th 403, 407–09 (4th Cir. 2022) (stating that "innocent explanations seem unlikely" when $111,252 had been wrapped in grocery bags and stashed in a hidden compartment). After all, "[i]t is common for [currency related to illegal drug transactions] to be wrapped in cellophane so as to minimize the ability for a drug-sniffing dog to detect the drug residue often found on such currency, and to secrete it in a hidden area of a vehicle to escape detection." *United States v. Reed*, 443 F.3d 600, 604 (7th Cir. 2006).

A reasonable officer could thus consider the vacuum sealed double-wrapping as an effort to conceal the odor of narcotics. This possibility could appear more likely when the dog jumped while sniffing the car. *See United States v. Klinginsmith*, 25 F.3d 1507, 1510 (10th Cir. 1994) (recognizing probable cause for an arrest when a dog alerted to the outside of a car); *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998) (same).

Mr. Hoskins explains that he hid the money to prevent theft. But an officer wasn't compelled to credit this explanation for concealment of the money in the car's lining. *See United States v. Reed*, 443 F.3d 600, 604 (7th Cir. 2006) (concluding that concealment of a large amount of cash

33

contributed to probable cause for an arrest even though the cash might have been hidden to prevent theft).

Mr. Hoskins also points out that after the dog alerted, there were no drugs found in the car. But a trooper could reasonably infer from the dog's reaction that the currency had been near illegal drugs. *See United States v. Saccoccia*, 58 F.3d 754, 778 (1st Cir. 1995) ("Ordinary experience suggests that currency used to purchase narcotics is more likely than other currency to have come into contact with drugs.").

Based on the large amount of cash, its wrapping and concealment, and the dog's leaps, Trooper Withers had at least arguable probable cause, triggering qualified immunity on the claim of an unlawful arrest.

### Issues Involving the DNA Sample

After Mr. Hoskins was arrested, he gave a DNA sample. But authorities never charged Mr. Hoskins with a crime. Under Utah law, authorities had an obligation to destroy the DNA sample. Utah Code Ann. § 53-10-406(1)(i) (2011).[17] But Mr. Hoskins allegedly lacks any way of knowing whether authorities destroyed the sample. So he sued for denial of due process.

For this claim, Mr. Hoskins alleges the right to a procedure that ensures the destruction of his DNA sample. Granted, the Fourteenth

---

[17]    This section has been renumbered § 53-10-406(1)(h) (2022).

Amendment's due process clause limits a state's ability to take away entitlements. *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 67 (2009). These entitlements can come from either the Due Process Clause itself or state law. *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989). But neither the Due Process Clause nor state law creates such an entitlement.

Mr. Hoskins relies on the constitutional right of privacy. But the Due Process Clause does not provide individuals with a freestanding right to their DNA evidence. *See Dist. Att'y's Off. for Third Jud. Dist.*, 557 U.S. at 72 (concluding that the Fourteenth Amendment's due process clause doesn't entitle defendants to evidence of their own DNA to prove factual innocence); *see also Boling v. Romer*, 101 F.3d 1336, 1340 (10th Cir. 1996) (upholding the constitutionality of a statute conditioning discretionary parole on collection of DNA).

In the absence of an underlying substantive right, the Fourteenth Amendment's due process clause doesn't create a protected interest in procedure alone. *Teigen v. Renfrow*, 511 F.3d 1072, 1081 (10th Cir. 2007). We addressed a similar issue in *Stein v. Disciplinary Board of Supreme Court of New Mexico*, 520 F.3d 1183 (10th Cir. 2008). There the plaintiffs claimed "a vested interest and confidence that the rules of procedure would be followed." *Id.* at 1192. We rejected this claim based on the lack of a constitutionally protected liberty or property interest. *Id.* We reasoned that

35

due process protects a substantive interest rather than serve as an end in itself. *Id.* Likewise, Mr. Hoskins's desire for procedural safeguards does not trigger a liberty or property interest.

Mr. Hoskins disagrees, asserting a substantive interest under state law. But he hasn't identified a state law that creates an entitlement. Instead, Mr. Hoskins argues that state law should provide a procedure to ensure the destruction of his DNA. This argument for a change in state law reflects the absence of a protected interest. *See Elliot v. Martinez*, 675 F.3d 1241, 1244 (10th Cir. 2012). The district court thus didn't err in dismissing the due process claim.

## Conclusion

The district court acted correctly in dismissing the action.

With the gloss of the video, Trooper Withers was entitled to stop Mr. Hoskins and conduct a dog sniff. The dog sniff created at least arguable probable cause to search the car. The car's license plate was partially obstructed, and the video shows that a trooper could reasonably believe that the dog had reacted to the odor of drugs. The resulting search yielded roughly $89,000 that was double-wrapped, vacuum packed, and hidden in the lining of the car. These circumstances created at least arguable probable cause to arrest Mr. Hoskins.

The trooper also pointed a gun at Mr. Hoskins for roughly eight seconds. We don't need to decide whether this action involved retaliation

36

or excessive force. Even if the conduct had been retaliatory or excessive, the violation wouldn't have been clearly established.

After pointing a gun, the trooper applied handcuffs, conducted a patdown, and placed Mr. Hoskins in the patrol car. But Mr. Hoskins had been acting angrily with his hands near or in his pockets. So the trooper didn't violate a clearly established right by taking protective measures before searching the car.

Finally, Mr. Hoskins lacked a protected interest in a procedure that would ensure the destruction of his DNA sample.